**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| BANK OF AMERICA, N.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 11-303 |
| | ) | |
| JAMES A. KNIGHT, DEFOREST DAVIS, | ) | Judge: Robert W. Gettleman |
| PAUL FLASK, MARIE O'BARR, CYNTHIA | ) | |
| KNIGHT, BARRY BRUBAKER, PETER | ) | Magistrate Judge: Morton Denlow |
| WILLMOTT, OLNEY LP, KNIGHT | ) | |
| QUARTZ FLOORING – GLOBAL, LLC, | ) | |
| ROBERT WASIELEWSKI, LISA ROGERS, | ) | |
| FGMK, LLC, FROST, RUTTENBERG, & | ) | |
| ROTHBLATT, P.C., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**AMENDED COMPLAINT**

Plaintiff Bank of America, N.A., successor by merger to LaSalle Bank National Association ("Bank of America"), by and through its counsel, Loeb & Loeb LLP, hereby complains of the Defendants as follows:

**I.     NATURE OF THE ACTION**

1.     This is an action against the officers, directors and controlling members of Knight Industries I LLC ("Knight Industries"), Knight-Celotex, LLC ("Knight-Celotex") and Knight Quartz Flooring, LLC ("KQF") (Knight Industries, Knight-Celotex, and KQF shall be referred to collectively herein as the "Knight Entities"), seeking to remedy their mismanagement, diversion of corporate assets, corporate waste, material misrepresentations, conversion of Bank of America's collateral, breaches of fiduciary duties and other violations of law. Among other things, the individual defendants failed to create and maintain a standard, modern, and reliable system of accounting, in accordance with Generally Accepted Accounting Principles, which

1

caused the issuance of materially misleading financial statements. Indeed, as stated in a March 2007 email from one of the Knight Entities' accounting staff to the Knight Entities' officers: "What you are doing here is 'cooking the books.'" The individual defendants further failed to maintain and implement, and/or consistently overrode, internal controls that, among other things, were designed to ensure compliance with the Knight Entities' obligations to Bank of America under the parties' Loan Agreements (as defined herein).

2.     This action also seeks to hold liable the independent auditors of the Knight Entities for failing to adequately review the Knight Entities' significant accounting policies for GAAP compliance, for failing to follow General Accepted Auditing Standards ("GAAS") in the performance of their audits and for issuing Independent Auditor Reports for fiscal years 2005, 2006, and 2007 stating that (with the exception of failing to consolidate the accounts of KQF) the financial statements of Knight Industries and its Subsidiaries presented fairly, in all material respects, the companies' financial position, the results of their operations and their cash flows in conformity with GAAP. Furthermore, the Auditor Defendants failed to detect and disclose the serious weaknesses in policies, procedures, systems and internal controls in the Knight Entities' financial accounting and reporting. These audit reports and accompanying audited financial statements assisted the officers, directors and controlling members in maintaining the façade of growth and solvency and in concealing the Knight Entities' deteriorating financial condition. The auditors directly caused injury to Bank of America by facilitating the actions of the Knight Entities' directors, officers and controlling members to obtain additional loans to perpetuate their misconduct, and to dissipate the assets of the Knight Entities, which constituted Bank of America's collateral.

## II.     VENUE AND JURISDICTION

3.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) as complete diversity exists between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events and wrongful conduct giving rise to the claims occurred in this judicial district.  Additionally, several of the Defendants reside in or maintain executive offices in this district, and have received substantial and excessive compensation and other unwarranted benefits in and/or from this district by engaging in numerous activities and conducting business here, which had a material effect in this district.

## III.    PARTIES

5.     Plaintiff Bank of America is a national banking association with its main offices located in North Carolina.  Bank of America is successor by merger to LaSalle Bank National Association.

6.     Defendant James A. Knight ("James Knight") is a citizen of New Hampshire. James Knight served in various positions of trust and exercised control over the Knight Entities.[1] During all times relevant hereto, James Knight was principal owner of Knight Industries and served as the Chief Executive Officer, Manager, and Chairman of the Advisory Board for Knight Industries.  James Knight also controlled the subsidiaries of Knight Industries, including Knight-

---

[1]     On February 23, 2010, James Knight filed a voluntary petition for relief under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of New Hampshire, which subsequently was transferred to the United States Bankruptcy Court for the Northern District of Illinois (the "Bankruptcy Court").  On or about November 10, 2010, the Bankruptcy Court entered an Order granting James Knight a discharge under section 727 of the Bankruptcy Code (the "Discharge Order") and the discharge injunction was issued pursuant to section 524 of the Bankruptcy Code.  Pursuant to the discharge injunction, Bank of America will not seek to collect in this action any judgment from, or seek to enforce any judgment against, James Knight personally.

Celotex. Through Knight Industries, James Knight also served as the Manager of KQF and as a member of KQF's Board of Members. From 2006 to October 2009, James Knight, individually or through The Wauregan Company, Inc. ("Wauregan"), James Knight's wholly owned company, received payments and transfers from the Knight Entities in excess of $2.5 million.

7.     Defendant Cynthia Knight is a citizen of New Hampshire. Cynthia Knight served as a member of the Advisory Board for Knight Industries and on KQF's Board of Members. Cynthia Knight also served as the general partner of Olney LP ("Olney"), which in turn, served as Manager of Knight Quartz Flooring-Global, LLC ("KQF-Global"). From at least February 2009 through the date of its bankruptcy filing, Cynthia Knight, through Olney and KQF-Global, served as Manager of KQF. Cynthia Knight is married to James Knight.

8.     Defendant DeForest Davis is a citizen of Illinois. DeForest Davis served as a member of both Knight Industries' Advisory Board and KQF's Board of Members. DeForest Davis owns an approximate 17% membership interest in KQF. From February 2006 to January 2009, DeForest Davis received payments and transfers from the Knight Entities of almost $200,000.

9.     Defendant Anthony Paul Flask ("Paul Flask") is a citizen of California. Paul Flask served as a member of both Knight Industries' Advisory Board and KQF's Board of Members. Paul Flask is the principal of Challenge I, Inc. Through Challenge I, Paul Flask owned an approximate 4% membership interest in KQF. From February 2006 to August 2008, Paul Flask, either individually or through Challenge I, received payments and transfers from the Knight Entities of over $130,000.

10.     Defendant Barry Brubaker is a citizen of Georgia. Barry Brubaker owned a membership interest in KQF and served as a member of KQF's Board of Members.

11.     Defendant Olney is a limited partnership formed in Illinois.  As of the filing of this Complaint, Cynthia Knight is Olney's sole general and limited partner, and therefore Olney is a citizen of New Hampshire.  Olney owned an approximate 13% membership interest in KQF. Olney also served as Manager of KQF-Global, who in turn purported to serve as KQF's Manager since at least February 2009.  Upon information and belief, Olney and KQF-Global are existing entities that are conducting business activities.

12.     Defendant KQF-Global is a Delaware limited liability company comprised of the following members:  Knight Industries, Olney, DeForest Davis, and Frederick W. Mowinkel. Knight Industries' sole member is James Knight, who, as described above, is a citizen of New Hampshire thereby making Knight Industries a citizen of New Hampshire.  As described above, Olney is a citizen of New Hampshire, and DeForest Davis is a citizen of Illinois.  Frederick W. Mowinkel is an individual and citizen of the foreign state of England.  Accordingly, KQF-Global is a citizen of New Hampshire, Illinois, and England.  As of no later than February 2009, KQF-Global served as the Manager of KQF.

13.     Defendant Peter Willmott is a citizen of Illinois.   Mr. Willmott owns an approximate 7% membership interest in KQF and served on KQF's Board of Members.

14.     Defendant Marie O'Barr is a citizen of Michigan.   During all times relevant hereto, Marie O'Barr served as a member of both Knight Industries' Advisory Board.   In February 2009, Marie O'Barr also became a member of KQF's Board of Members.   Marie O'Barr also was a founding investor of Knight Industries and served as the company's initial Chief Financial Officer.   From 2006 to 2009, Marie O'Barr received payments and transfers from the Knight Entities of over $660,000.

15.     Defendant Robert Wasielewski is a citizen of Illinois.  During all times relevant hereto, Robert Wasielewski served as Senior Vice President and Chief Financial Officer of Knight Industries and KQF.

16.     Defendant Lisa Rogers is a citizen of Illinois.  During all times relevant hereto, Lisa Rogers was a member of the senior management teams of Knight Industries and KQF, serving as Vice President of Shared Services, head of Human Resources and various other senior positions. Lisa Rogers also exercised control and authority over the accounting personnel for the Knight Entities.

17.     Defendants James Knight, Cynthia Knight, DeForest Davis, Paul Flask, Barry Brubaker, Olney, KQF-Global, Peter Willmott and Marie O'Barr are collectively referred to herein as the "Knight Insider Defendants."  Defendants James Knight, Robert Wasielewski and Lisa Rogers are collectively referred to herein as the "Knight Management Defendants."  The Knight Management Defendants, together with the Knight Insider Defendants, collectively are referred to as the "Knight Defendants."

18.     FGMK, LLC ("FGMK") is a limited liability corporation with its principal place of business in Illinois.  Each of the 23 constituent members of FGMK are citizens of Illinois. Accordingly, FGMK is also a citizen of Illinois.   Established in 1969 and located in suburban Chicago, FGMK touts itself as "a progressive Chicago certified public accounting and advisory firm," which "specialize[s] in assisting closely held companies."  According to its "Proposal to Provide Accounts Payable Consulting Services," submitted to Knight Industries in or about 2006, it employed a professional staff of "approximately 125, including 31 Partners" and "was ranked by Crain's Business Report as the eighth largest accounting firm in Chicago."

19.     Defendant Frost, Ruttenberg & Rothblatt, P.C. ("FR&R") is a professional services corporation incorporated in Illinois.   FR&R also maintains its principal place of business in Illinois.   FR&R touts itself as "one of the largest Midwest firms," "with a reputation for rendering outstanding accounting and tax services as well as insightful business advice."   FR&R offers "the services of approximately 80 accountants, tax specialists and consultants" at its corporate headquarters in Deerfield, Illinois and its Chicago, Illinois loop location.   FR&R claims to "invest [its] own time to learn [its] clients' philosophies, objectives and operations."

20.     Defendants FGMK and FR&R are collectively referred to herein as the "Auditor Defendants."

## IV.     BACKGROUND

21.     For many years, the Knight Defendants mismanaged the Knight Entities, by, among other things, failing to create and maintain a standard, modern and reliable accounting environment in accordance with GAAP, including sound internal controls and proper oversight of the accounting process and standards.   As a result, the Knight Entities materially overstated their assets and issued financial statements that were inaccurate and materially misleading.   Bank of America was induced to loan the Knight Entities more than $45 million over the course of three years based on the inaccurate, misleading and incomplete financial information.

22.     The Auditor Defendants issued written opinions stating the financial statements were presented in all material respects in accordance with GAAP.   The Auditor Defendants knew their audit opinions and the Knight Entities' audited financial statements would be provided to Bank of America by the Knight Defendants in accordance with the Knight Entities' loan covenants and knew and understood that Bank of America would be relying upon the audited

financial statements and the Auditor Defendants' written opinions in extending the Loans and lines of credit to the Knight Entities.

23.     The Knight Defendants also abused their fiduciary positions by lavishing benefits upon themselves at the expense of the Knight Entities and, ultimately, Bank of America, which was the largest secured creditor of the Knight Entities.  To hide their misconduct, self-dealing, and abuse of their positions of authority and control, the Knight Defendants utilized a complex and elaborate web of corporate entities to shuffle assets between companies in order to create the illusion of profitability and stability of the Knight Entities, in order to induce Bank of America to extend loans and financing, and to hide violations of various covenants within the Bank of America Loan Agreements.  The Knight Defendants thereafter inappropriately transferred assets and opportunities from the Knight Entities who were indebted to Bank of America to various other companies owned and/or controlled by the Knight Insider Defendants and stockpiled liabilities of those related entities in the Knight Entities.

24.     The Auditor Defendants failed to comply with GAAS and failed to detect and expose through their audits and audit reports the financial manipulations of the Knight Defendants and the deteriorating financial condition, the violation of various debt covenants, and the deficient financial controls of the Knight Entities, despite the Auditor Defendants' knowledge and express recognition in the audit workpapers and reports that Bank of America was relying upon their audits as a condition to the continued issuance of credit to the Knight Entities.

**A.  Knight Industries and Its Management.**

25.     Through various wholly-owned subsidiaries, Knight Industries was a manufacturer and distributor of fiberboard products that were primarily used in roofing systems.

26.     Knight Industries was originally formed in 2001 as an Illinois limited liability company named "Knight Industries LLC."  In 2005, Knight Industries LLC was reorganized as a Delaware limited liability company and changed its name to "Knight Industries I, LLC."

27.     James Knight served as Manager and President of Knight Industries at all times relevant to this Complaint.

28.     Under Knight Industries' Operating Agreement, the President serves as the chief executive officer and is responsible, among other things, for "the general supervision, direction, and control of the business and affairs of the Company."  As Manager and President of Knight Industries, James Knight also had the authority to appoint officers of the company and had supervisory authority over such officers and employees.  James Knight did, in fact, appoint Defendants Rogers and Wasielewski to serve as officers and, together with James Knight, to exercise supervisory control and authority over Knight Industries and its employees.

29.     Knight Industries was also managed by an Advisory Board of Directors, consisting of the following:  James Knight, DeForest Davis, Paul Flask, Marie O'Barr and Cynthia Knight (the "KI Advisory Board").

**B.   Knight-Celotex**

30.     Knight-Celotex is a wholly-owned operating subsidiary of Knight Industries that operated four fiberboard manufacturing facilities located in Danville, Virginia (the "Danville Plant"); Lisbon Falls, Maine (the "Lisbon Falls Plant"); Sunbury, Pennsylvania (the "Sunbury Plant"); and Marrero, Louisiana (the "Merrero Plant") (collectively, the "KI Real Estate Entities").

31.     Knight-Celotex was originally formed in April 2001.  At all relevant times, Knight-Celotex was managed by Knight Industries.  As the Manager of Knight Industries, James

Knight also controlled Knight-Celotex and the KI Advisory Board was responsible for the oversight and management of Knight-Celotex.

### C. Knight Quartz Flooring and Its Management.

32.     KQF produced quartz flooring products used in healthcare, education, retail, commercial and industrial applications.

33.     KQF was formed in 2002 as an Illinois limited liability company.  KQF was formed to exploit the business opportunities created by its acquisition of certain assets of Rickett Technology AS, including intellectual property related to the process of manufacturing quartz flooring.

34.     In its eight-year existence, KQF operated under numerous different names, including Knight-Rickett, LLC, Knight Premium Flooring, LLC, and Knight Industries Premium Flooring, LLC, all of which will be referred to herein under the name "KQF."

35.     KQF has never realized an annual profit.

36.     Knight Industries served as KQF's Manager.  As James Knight was Knight Industries' Manager, James Knight also controlled KQF.  James Knight also served as Chief Executive Officer and President of KQF.  Robert Wasielewski served as Senior Vice President and Chief Financial Officer.  Lisa Rogers served as Vice President of Shared Services.

37.     Under KQF's Operating Agreement, KQF also was managed by a Board of Members.  The KQF Board of Members consisted initially of 5 persons:  James Knight, Paul Flask, DeForest Davis, Barry Brubaker, and Peter Willmott (the "KQF Board"), which was required to meet no less than quarterly.  At some point thereafter, Cynthia Knight also joined the KQF Board.  Under KQF's Operating Agreement, the KQF Board was "to advise and consult with the manager on matters related to the strategic direction of the Company, acquisitions, divestures, and management performance evaluations."  Additionally, a majority of the KQF

Board's approval was required for the KQF Manager to enter into a sale of a material portion of KQF's assets or to enter into loans or contracts obligating KQF in an amount in excess of $1,000,000.

38.     On or about February 1, 2009, Knight Industries tendered its resignation as Manager of KQF to be effective as of the appointment of a successor manager.

39.     On or about February 8, 2009, KQF Board members and certain of KQF's members signed that certain Action Taken by Written Consent of the Members in Lieu of Meeting (the "Written Consent") pursuant to which KQF Global LLC was elected as KQF's Manager to replace Knight Industries.  KQF-Global was in turn managed by Olney LP whose general partner is Cynthia Knight.

### D.  Bank of America Provided a Credit Facility of More Than $45 Million to the Knight Entities.

40.     Bank of America provided a credit facility of more than $45 million in secured financing (the "KI Loans") to Knight Industries, Knight-Celotex and certain of their affiliates (collectively, the "KI Borrowers") pursuant to that certain Amended and Restated Loan and Security Agreement dated February 14, 2006 (the "Original KI Loan Agreement"), as amended by:  (a) the First Amendment to Amended and Restated Loan and Security Agreement dated as of May 22, 2006 (the "First Amendment");  (b) the Second Amendment to Amended and Restated Loan and Security Agreement, dated as of July 10, 2006 (the "Second Amendment");  (c) the Third Amendment to Amended and Restated Loan and Security Agreement dated as of September 12, 2006 (the "Third Amendment");  (d) the Fourth Amendment to Amended and Restated Loan and Security Agreement dated as of January 31, 2007 (the "Fourth Amendment");  (e) the Fifth Amendment to Amended and Restated Loan and Security Agreement dated as of February 1, 2007 (the "Fifth Amendment"); and (f)  the Sixth Amendment to the Amended and

Restated Loan and Security Agreement dated as of September 25, 2007 (the "Sixth Amendment"). The Original KI Loan Agreement, together with the First Amendment, Second Amendment, Third Amendment, Fourth Amendment, Fifth Amendment and Sixth Amendment, shall be collectively referred to herein as the "KI Loan Agreements."

41. The KI Loans were evidenced, in part, by the following five promissory notes:

(a) that certain Capex Note dated February 14, 2006, in the original principal amount of $2,500,000 (the "Capex Note");

(b) that certain Term Note B dated February 14, 2006, in the original principal amount of $5,000,000.00 (the "Term Note B");

(c) that certain Capex Note #2 dated September 25, 2007, in the original principal amount of $1,500,000.00 (the "Capex Note #2);

(d) that certain Revolving Note dated September 25, 2007, in the maximum principal amount of $14,500,000.00 (the "Revolving Note"); and

(e) that certain Term Note dated September 25, 2007, in the original principal amount of $16,750,000.00 (the "Term Note").

42. From time to time, Bank of America advanced additional funds pursuant to the KI Loan Agreements. Specifically, Bank of America extended a new capital expenditure line of credit in the amount of $1,000,000.00 pursuant to the Fourth Amendment, and Bank of America reduced the revolver by $1,500,000.00, but increased the term loan and capital expenditure loan by $2,000,000.00 and $500,000.00, respectively, pursuant to the Sixth Amendment.

43. In addition, Bank of America extended $1.3 million in secured financing (the "KQF Loan") to KQF pursuant to that certain Loan and Security Agreement dated February 14, 2006 (the "Original KQF Loan Agreement"), as amended by: (a) the First Amendment to Loan

and Security Agreement dated as of March 31, 2007 (the "First KQF Amendment"); (b) the Second Amendment to Loan and Security Agreement and Reaffirmation Guaranty dated as of June 30, 2007 (the "Second KQF Amendment"); and (c) the Third Amendment to Loan and Security Agreement and Reaffirmation of Guaranty dated as of September 25, 2007 (the "Third KQF Amendment"). The Original KQF Loan Agreement, together with the First KQF Amendment, Second KQF Amendment, and Third KQF Amendment shall be collectively referred to herein as the "KQF Loan Agreements." The KI Loan Agreements and the KQF Loan Agreements shall be collectively referred to herein as the "Loan Agreements."

44.     The KQF Loan was evidenced, in part, by that certain Revolving Note dated as of August 31, 2007, in the original principal amount of $1,300,000.00 (the "KQF Note").

45.     The Loan Agreements required the Knight Entities to, among other things:

   a.    Maintain a standard and modern accounting system in accordance with GAAP;

   b.    Provide to Bank of America on an annual basis audited consolidated financial statements of the Knight Entities;

   c.    Provide to Bank of America on a monthly basis unaudited consolidated financial statements of each the Knight Entities;

   d.    Furnish all financial statements in accordance with GAAP;

   e.    Refrain from making any change to accounting principles without prior notice to Bank of America;

   f.    Promptly provide to Bank of America copies of interim and supplemental reports submitted by independent accountants in connection with any interim audit or review of the books of any Knight Entity;

   g.    Deliver to Bank of America a Borrowing Base Certificate on a monthly basis;

   h.    Deliver to Bank of America an aged schedule of accounts on a monthly basis;

   i.    Deliver to Bank of America an inventory report on a monthly basis;

   j.    Deliver to Bank of America computations showing compliance with financial covenants on a monthly basis; and

       k.     Utilize Bank of America as their primary bank account and depository for all financial services.

46.    The Loan Agreements also prohibited certain expenditures by the Knight Entities, including but not limited to:

       a.     Any new investments (whether through purchase of stocks, obligations or otherwise) in, or loans or advances to, any other Person;[2]

       b.     making loans to employees of the Knight Entities in excess of $250,000 in the aggregate at any one time;

       c.     purchasing or redeeming, directly or indirectly, any shares of its stock or its membership interests, or declaring or paying any dividends (other than stock dividends), whether in cash or otherwise, or setting aside any funds for any such purpose *or making any distribution to its shareholders or members*, other than (i) payments in respect of certain, defined obligations, and (ii) quarterly distributions to cover income tax payment obligations.

47.    The Knight Entities secured the KI Loan and the KQF Loan (collectively, "the Loans") by granting Bank of America, among other things, a first priority security interest in all of the Knight Entities' accounts, inventory, equipment, general intangibles, commercial tort claims, instruments, software and computer programs, investment property and other property (collectively, the "Collateral").

48.    A significant portion of the Loans consisted of revolving credit facilities that were intrinsically tied to the Knight Entities' inventory and accounts receivable. Thus, Bank of America relied heavily on the financial information and reports of the Knight Entities in determining the amount of the credit available to the Knight Entities. As such, audited financial statements prepared by independent and reputable auditors and the auditors' assessment of the accounting systems utilized by the Knight Entities were of critical importance in Bank of America's decision to extend the credit to the Knight Entities. The audited financial statements

---

[2] "Person" is defined as any individual, partnership, limited liability company, corporation, trust, joint venture, joint stock company, association, unincorporated organization, government or agency or political subdivision thereof, or other entity.

were required by the Loan Agreements and intended by Bank of America to provide it with independent verification of the accounting systems utilized by the Knight Entities and the financial information being provided to Bank of America in support of the advances under the Loan Agreements.

49.     The Auditor Defendants were aware, and reasonably knew and understood, that under the Loan Agreements the Knight Entities were required to maintain a standard and modern accounting system in accordance with GAAP and were required to provide the audited financial statements to Bank of America.  The Auditor Defendants further knew and understood that Bank of America was relying upon the audited financial statements not only in extending and amending the Loan Agreements, but also in continuing to allow the Knight Entities to borrow against established credit limits.

## V.     THE DOWNFALL AND BANKRUPTCY OF THE KNIGHT ENTITIES.

### A.     The Knight Defendants' Complicity in the Knight Entities' Demise and Manipulation of Financial Reports to Bank of America to Mask the Deteriorating Financial Condition.

50.     The Loan Agreements required that the Knight Entities at all times maintain a standard and modern accounting system in accordance with GAAP and furnish to Bank of America annual, monthly and other financial statements in accordance with GAAP.

51.     Notwithstanding, the Knight Management Defendants failed to create and maintain a standard and modern accounting system in accordance with GAAP for the Knight Entities, and the Knight Insider Defendants, as Board members and Managers, failed to properly oversee the Knight Entities to ensure compliance with their accounting and reporting obligations.

52.     As a result, the Knight Entities issued annual, monthly and other financial statements and reports to Bank of America that were materially inaccurate and were not appropriately supported by, or in conformance with, GAAP.

53. Among other violations, the Knight Management Defendants failed to timely and properly record and/or write-down accounts receivable to reflect, among other things, credits earned by its customers under Knight Industries' Customer Incentive Program ("CIP"), short payments, and other deductions and/or write-offs for bad accounts. As a result, the Knight Entities' accounts receivables were materially overstated for all times relevant to this action.

54. The Knight Management Defendants also failed to record earned but unused CIP credits as liabilities thereby making it appear that Knight Industries' sales were greater than in fact they were.

55. Additionally, from at least 2007 and for all relevant times thereafter, the Knight Management Defendants caused the Knight Entities to fail to record inventory reductions as required by GAAP.

56. Additionally, from at least 2007, the Knight Management Defendants entirely abandoned basic accounting protocols, by failing, among other things, to state inventory per the general ledger at the lower of cost or market in conformity with GAAP. For instance, as of December 31, 2007, the slow-moving finished goods inventory totaled approximately $2,400,000 of the $5,750,000 inventory balance, or 42%. The inventory valuation continued to deteriorate without proper recording thereafter.

57. Throughout 2008, the Knight Entities' internal monthly financial statements were falsely and inaccurately prepared, including manipulations of the bad debt reserve and accrued liabilities.

58. As a result, the Knight Management Defendants caused the Knight Entities to materially inflate the amount of inventory and the value of the accounts receivable on the Borrowing Base Certificates submitted to Bank of America and thereby enabled the Knight

Entities to borrow more money than would otherwise have been permitted under the terms of the Loan Agreements.

59.     These matters were not mere oversights or mistakes.   In fact, the accounting improprieties and GAAP violations were identified and brought to the Knight Defendants' attention by various members of the Knight Entities' accounting staff.

60.     For instance, in a February 16, 2007 email, a member of the Knight Entities' accounting staff opined that approximately $129,000 of inventory should be written-off. Defendant Wasielewski, with James Knight copied on the email, states: "Guys; we all know what [GAAP] is, but I am killing myself trying to maintain borrowing base liquidity to keep plants up.  Another inventory write down does not help.  Interim statements are not audited and represented as GAAP.  I beseech you to work with me on truly relevant items such as liquidity management.  Book the write-off over 3 months."  James Knight later in the email exchange states: "He is right[.]  This is not a priority [.]  The GAAP issue is being over played[.]"

61.     In a March 2007 email communication amongst the Knight Entities' accounting staff, under the subject line "$250k Inventory Adjustment/March," Defendant Wasielewski again instructs an internal accountant, "we need all the March inventory adjustments to be spread over 3 months; as such, only 1/3 of all amounts would be taken in March with 2/3 booked back to inventory as of 3/31/07."  One of the members of the accounting department then responded to Defendant Wasielewski, copying Defendants James Knight and Rogers on the email, stating

> "Rob, You cannot make the rules up as you go.  The [sic] are GAAP that any accountant worth his weight lives by.  When you say Knight is not a publicly traded company therefore GAAP does not apply, I strongly disagree!  *You still have banks and shareholders who rely on the fairness of Knight Industries financial statements*.  What you are doing here is 'cooking the books'. I want nothing to do with it."  (emphasis added).

62.     Bank of America reasonably relied on the annual, monthly and other financial statements and reports in continuing to loan money to the Knight Entities to operate and pay the Knight Defendants' salaries and "consulting" and other payments to insiders and in increasing the lines of credit to the Knight Entities.  Had Bank of America known of the true financial condition of the Knight Entities, it could have and would have taken corrective action to halt the pillaging of the Company by insiders and the spiraling decline of the Knight Entities, and would have taken possession of the entities sooner so as to have maximized value and lessened the substantial shortfall on the Loan that exists today.

**B.      The Demise of Knight Industries and Knight-Celotex.**

63.     By at least December 31, 2007, the Knight Entities were insolvent.  However, in reliance on the materially false and inaccurate Borrowing Base Certificates and monthly and annual financial statements and reports, which were audited on an annual basis by the Auditor Defendants, approved by the Knight Insider Defendants and issued by the Knight Management Defendants, Bank of America continued to loan money to the Knight Entities under the Loan Agreements.

64.     Notwithstanding the insolvency of the Knight Entities, the Knight Defendants continued to dissipate the assets of the Knight Entities, including Bank of America's Collateral, by, among other things:

> a.      transferring to themselves millions of dollars in excessive compensation in the form of consulting fees and other remuneration through The Wauregan Company, which James Knight owned and controlled, and through other entities owned and/or controlled by the Knight Defendants, for little or no value in return at a time when the Knight Entities were insolvent,
>
> b.      allowing James Knight to transfer to himself fees in the amount of $20,000 per month – for a total of at least $560,000 – as a purported "fee" for his execution of the KE Guaranty and the KQF Guaranty.

65.     In addition, the Knight Defendants further dissipated the assets of the Knight Entities by causing and/or allowing the physical deterioration of the Knight Entities' manufacturing plants and equipment due to the failure to properly maintain the manufacturing plants and equipment and by usurping, and/or allowing certain Knight Defendants to usurp, the Knight Entities' intellectual property and business opportunities.

**C.      Knight Industries and Knight-Celotex File for Bankruptcy**

66.     On September 30, 2008, the Revolving Note matured and the KI Borrowers defaulted by failing to pay the indebtedness due under the Revolving Note.   Upon the KI Borrowers' default, the outstanding indebtedness under the KI Loan, totaling in excess of $34 million, became due and payable in full by the KI Borrowers.   The KI Borrowers failed, however, to pay the outstanding indebtedness.

67.     On April 6, 2009, Knight Industries and Knight-Celotex filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

68.     On April 7, 2009, Knight Industries, controlled by James Knight, filed an emergency motion seeking authority to use Bank of America's cash collateral through April 24, 2009.   Knight Industries was to provide Bank of America a weekly budget of all projected expenses on a cash basis necessary for operation, preservation and maintenance of Bank of America's Collateral. The Court authorized this request subject to a number of conditions including:  (a) Knight Industries was authorized to pay only up to 105% of the budgeted amount for each expense category reflected on the corresponding weekly budget, and (b) Knight Industries would achieve 90% of the weekly sales and cash collections set forth in the weekly budget.   The Knight Management Defendants caused Knight Industries to violate these conditions routinely.

69.     Knight Industries was also to provide weekly operating reports to Bank of America. However, counsel for Knight Industries later conceded that every weekly operating report that Knight Industries had previously submitted to Bank of America was materially in error and needed to be corrected, including the following:

a.      Knight Industries overstated its opening cash balance by $110,000;

b.      Knight Industries overstated its beginning inventory balance by more than $2,000,000; and

c.      Knight Industries failed to include the expense for salaried payroll on each of its weekly operating reports

70.     On June 5, 2009, the cash collateral orders expired such that Knight Industries and Knight-Celotex then lacked any authority to use Bank of America's Cash Collateral. As of June 10, 2009, James Knight resigned each of his positions held with Knight Industries and Knight-Celotex.

71.     On June 11, 2009, the Bankruptcy Court converted Knight Industries' and Knight-Celotex's bankruptcy cases to chapter 7 of the Bankruptcy Code. Barry A. Chatz (the "Chapter 7 Trustee") was duly appointed as trustee of both companies' bankruptcy estates. On June 22, 2009, on motion by Bank of America, David Baker was appointed as Receiver over the KI Real Estate Entities and the other KI Borrowers that had not filed bankruptcy petitions.

72.     It was not until after the chapter 7 filing by Knight Industries and Knight-Celotex and the appointment of the Receiver over the KI Real Estate Entities and the other KI Borrowers in June 2009 that Bank of America began to discover the true financial condition of the Knight Entities, including but not limited to:

a.      the Knight Management Defendants had materially misstated the value of Knight Industries' inventory and accounts receivable;

20

      b.    Knight Industries and Knight-Celotex had incurred more than $1 million of post-petition liabilities that were in excess of the authorized expenses and were not previously reported to Bank of America or the Court.

73.    Prior to the bankruptcy filing, Knight Industries' fiber-board based product line purportedly held the largest market share in the U.S. replacement roofing market. Knight Industries was one of two competitors that held over 70% of the market for roofing substrate material in the U.S. Given its position within the market and projected financial performance for 2009, Knight Industries had an enterprise value of approximately 3.5X – 4.5X EBITDA, or approximately $23-25 million.

74.    However, because of the Knight Defendants' gross mismanagement of Knight Industries, Knight-Celotex, and the KI Real Estate Entities, their mass diversion and waste of corporate assets, their failure to maintain and implement adequate internal controls, and their failure to maintain a standard, reliable accounting system to generate accurate and reliable financial and accounting records, the proceeds from the sale were substantially less than would have been recovered had the Knight Defendants properly exercised their fiduciary duties to act in the Knight Entities' best interests.

75.    By the end of 2009, the Trustee and Receiver completed the sale of substantially all of the operating assets of Knight Industries, Knight-Celotex and the KI Real Estate Entities and were able to recover gross proceeds of only approximately $13 million.

76.    The loss in value of $12-14 million is primarily due to the following:

      a.    First, lacking an effective accounting and internal controls system, the Knight Management Defendants generated misleading consolidated financial statements and forecasts using inaccurate inventory, accounts receivable and cost data. The Knight Management Defendants overrode and/or ignored information from the Company's plant managers and accounting personnel who attempted to correct the errors. Prospective

21

buyers were, thus, unable to reconcile Knight Industries' pro-forma financial forecasts against its reported history. As a result, many prospective buyers withdrew from the bidding, while others substantially discounted their offers.

b.     Second, having diverted millions of dollars from Knight Industries to various insiders and affiliated entities that should have been used as working capital and/or for capital expenditures, the Knight Management Defendants recklessly ignored basic maintenance requirements for its plants, over the requests and objections of the Company's plant managers. At the time of the sale, prospective buyers concluded that they would need to invest as much as $5 million to bring the Danville and Lisbon Falls plants (the key properties of Knight Industries) up to even basic, minimal standards. Among other things, any potential buyer would need to spend millions on required maintenance for key equipment, clearing and bringing to code several abandoned buildings and/or annexes filled with obsolete equipment and inventory, remediation of latent environmental issues, and investment in productivity improvements.

c.     Third, having diverted millions of dollars from Knight Industries to various insiders and affiliated entities that should have been used as working capital and/or for capital expenditures, and having rejected proposals by Bank of America to enter into a forbearance agreement or to negotiate a DIP loan facility to continue operations during the period of reorganization, the Knight Defendants were unable to keep Knight Industries and Knight-Celotex operating during their peak 2009 sales season. As a result, all operations were forced to shut down, which in turn forced customers to buy from competitors, rendered existing inventory outdated and less marketable, and further depleted and/or deteriorated the conditions of the Knight Entities' plants and equipment. As a result, when the Receiver and Trustee attempted to sell the assets, they were forced to significantly scale back the projected financial performance of the Knight Entities and, instead of an anticipated $7-8 million EBITDA on $55-60 million in ongoing revenue, prospective buyers were presented with best case scenarios of projected losses in year one, modest EBITDA in year two, and roughly $6 million in EBITDA in year three. Prospective purchasers with lower and more conservative projections resulted in still lower bids.

77.     Pursuant to an Order dated December 15, 2009, the Bankruptcy Court allowed Bank of America's secured claim against Knight Industries and Knight-Celotex in an amount in excess of $34,000,000 for principal and accrued interest as of April 6, 2009, exclusive of additional amounts owing for swap obligations and costs, fees, and expenses.

**D.** **Knight Industries' Officers Divert More Than $4 Million to KQF Shortly Before Filing for Bankruptcy.**

78.     KQF reported substantial losses in each year of its existence.  Indeed, for each year from 2005 through 2007, excluding member capital contributions, KQF's liabilities exceeded its assets.

79.     Despite KQF's continuing losses, the Knight Management Defendants caused Knight Industries to advance millions of dollars to KQF and incur millions of dollars of expenses on behalf of KQF, without any benefit to Knight Industries or any prospect of recovery of those assets.

80.     In particular, as of December 31, 2007, the Knight Management Defendants had caused Knight Industries to make interest free, unsecured advances totaling more $3.4 million to KQF.

81.     By April 2009, when Knight Industries and Knight-Celotex filed their bankruptcy petitions, the Knight Management Defendants had caused Knight Industries to make more than $4.2 million in advances to KQF from Bank of America's Collateral, which in turn, dissipated the Collateral.

82.     Furthermore, the KI Advisory Board knew, or should have known, that KQF was unable to repay the advances from Knight Industries, but affirmatively permitted, or was grossly negligent in failing to halt, these advances for no consideration and/or prospect of repayment.

83.     Additionally, from fiscal year 2005 through 2007, Knight Industries also incurred direct expenses on behalf of KQF totaling almost $850,000.  Although Knight Industries, as KQF's Manager, was entitled under the KQF Operating Agreement to reimbursement of such expenses, the Knight Defendants never made any demand on KQF or otherwise sought reimbursement from KQF for such expenses.  Knight Industries received no consideration or

benefit from having incurred such expenses on behalf of KQF. These expenses were paid with Bank of America's collateral.

84.     As Defendants James Knight, Robert Wasielewski and Lisa Rogers also served as officers of KQF, and Defendants DeForest Davis, Paul Flask and Cynthia Knight served on the Advisory Board for each Company, they each knew or should have known that KQF would be unable to repay either the advances made to KQF or the expenses incurred on KQF's behalf. Notwithstanding, these Defendants were hopelessly conflicted and failed to perform their fiduciary duties to either Knight Industries or KQF by allowing these advances.

85.     Moreover, the Knight Defendants also violated their duty of care, good faith and loyalty, by causing Knight Industries to make these substantial loans to KQF without requiring KQF to enter into reasonable and appropriate loan agreements and/or promissory notes to evidence KQF's indebtedness to Knight Industries.

86.     Additionally, in contravention of ordinary and usual business practices, during the substantial majority of time in which KQF operated, it did so on Knight Industries' premises without any lease and without paying reasonable rent. In 2004, KQF paid $126,000 in rent to Knight Industries. In 2005, KQF paid only $67,864 in rent. In 2006, KQF paid $40,016 in rent payments to Knight Industries. In 2007, KQF paid no rent to Knight Industries. KQF's use of Bank of America's real property Collateral in Louisiana without paying market rate rent further dissipated Bank of America's Collateral.

87.     Finally, in April 2009, when Knight Industries was filing for bankruptcy protection and the Knight Management Defendants knew that its business practices would come under scrutiny, Knight Industries and KQF entered into a sham lease requiring KQF to pay

Knight Industries a nominal rental payment. The Receiver estimated that the annual rent under the lease equaled less than $.03 per square-foot.

88.    On November 23, 2009, the Receiver subsequently appointed to manage the affairs of Merrero Property LLC filed suit to void the lease as being substantially below market and the result of insider dealing, because the below-market lease substantially impaired his ability to obtain full value for Knight Industries' property.

89.    In permitting Knight Industries' assets to be used by KQF for little or no consideration and without protecting Knight Industries by following reasonable business practices such as requiring KQF to enter into a written, market-based lease agreement, the Knight Defendants violated their duty of care, good faith and loyalty to Knight Industries.

90.    Defendants DeForest Davis, Cynthia Knight, Barry Brubaker and Paul Flask also have acted together with other KQF insiders to use intellectual property belonging to KQF in order to produce products identical to those formerly produced by KQF, thereby usurping corporate opportunities belonging to KQF. The other Knight Defendants permitted this usurpation in further derogation of the Knight Defendants' duty of care, good faith and loyalty.

**E.   The Subsequent Demise of KQF**

91.    On August 31, 2008, the KQF Loan matured, and KQF defaulted by failing to pay the outstanding indebtedness, totaling $1,300,000, exclusive of interest, costs, expenses, and fees.

92.    On August 7, 2009, Bank of America commenced an action against KQF seeking to enforce its rights under the governing loan documents, including seeking the appointment of a Receiver to obtain control over KQF. On January 22, 2010, the Court granted Bank of America's motion and appointed a receiver.

93.    Hours later, KQF filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.   On February 4, 2010, KQF brought an emergency motion for the appointment of a chapter 11 receiver citing the "obvious conflicts arising from [Cynthia Knight's] managing role with KQF and her participation in an investor group that desire[d] to acquire KQF's assets" — a conflict of interest that in fact had existed since at least May 15, 2009, when Cynthia Knight had become CEO and President of KQF Acquisition, Inc., whose purpose was to serve as a vehicle to acquire KQF.  Indeed, Defendants Paul Flask, DeForest Davis and Barry Brubaker were also members of KQF Acquisition while also simultaneously serving on KQF's Board of Members.

94.    On February 4, 2010, the Court granted KQF's motion directing the appointment of a chapter 11 trustee to assume control of KQF.  On February 11, 2010, Barry A. Chatz, who was serving as the Chapter 7 Trustee of Knight Industries' and Knight-Celotex's bankruptcy estates, was duly appointed as the chapter 11 trustee over KQF.

95.    Soon after assuming control of KQF, the chapter 11 trustee determined that KQF's operations could not be profitably restarted and moved to convert the case to chapter 7. On February 16, 2010, the Bankruptcy Court converted KQF's bankruptcy case to chapter 7 and Barry A. Chatz was duly appointed as Chapter 7 Trustee of KQF's bankruptcy estate.

96.    After assuming control of KQF in February 2010, the Chapter 7 Trustee discovered that KQF had been grossly overstating its inventory by reporting goods that had become obsolete or defective at full value.  Indeed, as of December 31, 2008, KQF was reporting finished goods inventory of more than $1.5 million, when in fact few of those goods had any value.  In fact, unbeknownst to Bank of America, in early 2009, KQF had advertised a

liquidation sale in which it offered to sell such inventory at a 75% discount. Nevertheless, KQF continued to account to Bank of America for such inventory at full value.

97.     The Chapter 7 Trustee, employing well-qualified professionals, actively marketed the sale of KQF's assets, including its machinery, equipment and inventory. After contacting over a dozen potential purchasers, only five expressed interest in making a bid and engaged in various degrees of due diligence. After discovering KQF's true financial state of affairs, only one purchaser made an offer. The Chapter 7 Trustee, with the Bankruptcy Court's approval, ultimately agreed to sell KQF's assets to that purchaser for a mere $375,000.

98.     KQF had received nearly $4.3 million in loans and advances from Knight Industries – advances that were funded using Bank of America's Collateral. Bank of America had directly loaned KQF another $1.3 million as part of the KQF Loan. Yet, Defendants through their gross mismanagement and conversion of assets of KQF had dissipated all but $375,000 of KQF's assets.

### F.   The Knight Defendants' Continued Diversion and Conversion of Assets

99.     On May 6, 2009, several KQF insiders caused the formation of KQF Acquisition Company LLC ("KQF-Acquisition"). Cynthia Knight served as KQF-Acquisition's President, Chief Executive Officer and Manager. John G. Sprenger, who had served as General Manager of KQF, became Vice President, Chief Operating Officer and General Manager of KQF-Acquisition. KQF-Acquisition was owned by Freeborn Holdings, LLC (in turn owned by James and Cynthia Knight), DeForest Davis, Barry Brubaker, and Paul Flask through Challenge I, Inc. Additionally, Cynthia Knight, DeForest Davis, and Barry Brubaker comprise KQF-Acquisition's Board of Directors.

100.     On or about May 27, 2010, Quartz Flooring Distribution North America LLC ("QFD-NA") was formed by KQF-Acquisition and Knight Performance Flooring Co. Ltd. ("Knight Performance").

101.     In a press release, QFD-NA touted that it manufactures Knight Performance Flooring's line of tile in a facility near Shanghai, China, which is "identical in specifications and performance to products formerly produced by" KQF.

## VI.     THE AUDITOR DEFENDANTS AND THE AUDITS OF THE KNIGHT ENTITIES FOR FISCAL YEARS 2005, 2006 AND 2007.

### A.     RETENTION OF FR&R TO CONDUCT THE AUDIT OF THE KNIGHT ENTITIES

102.     FR&R was engaged by Knight Industries to "audit the consolidated balance sheet of Knight Industries, LLC and its Subsidiaries … and the related consolidated statements of income, and cash flows" for the years ended December 31, 2005, and December 31, 2006.

103.     In its engagement letters for those audit years, FR&R represented that:

> The objective of our audit is the expression of an opinion about whether your financial statements **are fairly presented, in all material respects, in conformity with, U S generally accepted accounting principles. Our audit will be conducted in accordance with U.S. generally accepted auditing standards and will include tests of your accounting records and other procedures we consider necessary to enable us to express such an opinion.** If our opinion is other than unqualified, we will discuss the reasons with you in advance. If, for any reason, we are unable to complete the audit or are unable to form or have not formed an opinion, we may decline to express an opinion or to issue a report as a result of this engagement.

104.     For each of those audit years, FR&R issued an opinion stating that, except for the effects of not consolidating KQF, the financial statements present fairly, in all material respects, the financial position of Knight Industries.

105.     FR&R further represented that:

> Our procedures will include tests of documentary evidence supporting the transactions recorded in the accounts, tests of the physical existence of

inventories, and direct confirmation of receivables and certain other assets and liabilities, by correspondence with selected customers, creditors, and financial institutions. We will also request written representations from your attorneys as part of the engagement, and they may bill you for responding to this inquiry. At the conclusion of our audit, we will also require certain written representations from you about the financial statements and related matters.

An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements; therefore, our audit will involve judgment about the number of transactions to be examined and the areas to be tested. Also, **we will, plan and perform the audit to obtain reasonable assurance about whether the, financial statements, are, free of material misstatement, whether from errors, fraudulent financial reporting, misappropriation of assets, or violations of laws** or governmental regulations that are attributable to the entity or to acts by management or employees acting on behalf of the entity. Because an audit is designed to provide reasonable, but not absolute, assurance and because we will not perform a detailed examination of all transactions, there is a risk that material misstatements may exist and not be detected by us. In addition, an audit is not designed to detect immaterial misstatement or violations of laws or governmental regulations that do not have a direct and material effect on the financial statements. However, we will inform you of any material errors that come to our attention and we will inform you of any fraudulent financial reporting or misappropriation of assets that comes to our attention. We will also inform you of any violations of laws or governmental regulations that come to our attention, unless clearly inconsequential. Our responsibility *as* auditors is limited to the period covered by our audit and does not extend to any later periods for which we are not engaged as auditors.

Our audit will include obtaining an understanding of internal control sufficient to plan the audit and to determine the nature, timing and extent of audit procedures to be performed. (emphasis added).

106. For fiscal year ended December 31, 2005, FR&R issued its audit report sometime on or after the opinion date of March 9, 2006. For fiscal year ended December 31, 2006, FR&R stated in its engagement letter that it expected to begin its preliminary audit work in the fall of 2006 and to issue a report no later than May 15, 2007. The report for the calendar year ended December 31, 2006, finally was issued sometime on or after the opinion date of June 25, 2007

**B.     RETENTION OF FGMK TO CONDUCT THE AUDIT OF THE KNIGHT ENTITIES.**

107.    FGMK was engaged by Knight Industries to "audit the consolidated balance sheet of Knight Industries, LLC and Subsidiaries as of December 31, 2007, and the related consolidated statements of income (operations) and cash flows for the year then ended."

108.    In its engagement letter, directed "to the Board of Directors for Knight Industries, LLC and Subsidiaries, and copied to Defendant Wasielewski, FGMK represented that:

> **The objective of our audit is the expression of an opinion about whether your financial statements are fairly presented, in all material respects, in conformity with U.S. generally accepted accounting principles. Our audit will be conducted in accordance with U.S. generally accepted auditing standards and will include tests of your accounting records and other procedures we consider necessary to enable us to express such an opinion**.  If our opinion is other than unqualified, we will discuss the reasons with you in advance. If, for any reason, we are unable to complete the audit or are unable to form or have not formed an opinion, we may decline to express an opinion or to issue a report as a result of this engagement.  (emphasis added).

109.    In its opinion for the fiscal year ended December 31, 2007, FGMK noted that the accounts of KQF were not consolidated and that these accounts should be consolidated in order to conform with accounting principles generally accepted in the United States.  However, FGMK issued an opinion for that audit year that was otherwise unqualified and FGMK never purported to be unable to complete the audit or form an opinion.  Nor did it decline to express an opinion or issue a report for that audit year.

110.    FGMK further represented that:

> Our procedures will include tests of documentary evidence supporting the transactions recorded in the accounts, tests of the physical existence of inventories, and direct confirmation of certain assets and liabilities by correspondence with selected customers, creditors, and financial institutions.  We will also request written representations from your attorneys as part of the engagement.  At the conclusion of our audit, we will require certain written

30

representations from you about the financial statements and related matters.

An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements; therefore, our audit will involve judgment about the number of transactions to be examined and the areas to be tested. **We will plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether from (1) errors, (2) fraudulent financial reporting, (3) misappropriation of assets, or (4) violations of laws or governmental regulations that are attributable to the entity or to acts by management or employees acting on behalf of the entity**.

\*\*\*\*

**Our audit will include obtaining an understanding of the entity and its environment, including internal control, sufficient to assess the risks of material misstatement of the financial statements and to design the nature, timing, and extent of further audit procedures**.  (emphasis added).

111.    Notably, at the time FGMK was engaged to conduct the requisite audit of the Knight Entities' financial statements, FGMK also provided a "Proposal to Provide Accounts Payable Consulting Services" for Knight Industries.

C.    **THE AUDITS OF THE KNIGHT ENTITIES BY THE AUDITOR DEFENDANTS.**

112.    The claims asserted herein against the Auditor Defendants arise from the conduct of each of the firms while purportedly acting as the Knight Entities' independent auditor in the fiscal years ended December 31, 2005, December 31, 2006, and December 31, 2007.

113.    As detailed below, the information that was or should have been developed and revealed during the course of the annual audits constituted or exposed numerous audit "red flags," which should have made the Auditor Defendants skeptical and/or suspicious regarding the integrity of senior management, the reliability and competency of certain of the Knight Entities' internal accounting personnel, and thus, the reliability of the information, representations and financial data being provided to the Auditor Defendants by those individuals.

114. Despite the numerous red flags, the Auditor Defendants failed to identify and failed to perform sufficient and customary testing and audit procedures, and therefore, failed to detect and report the material misstatements in the Knight Entities' financial statements.

115. The Auditor Defendants knew that Bank of America was relying on the financial statements of the Knight Entities being reviewed and audited by the Auditor Defendants and further knew that it was the intent of the Knight Entities to provide Bank of America with these audited financial statements to comply with the covenants in the Loan Agreements and to induce Bank of America to loan additional funds.

116. Specifically evidencing this knowledge:

- FGMK expressly acknowledged in its Engagement Acceptance Form, dated December 31, 2007, under the item requesting a brief description of the "intended use of the financial statements" that, among other things, the "[f]inancial statements will be distributed to lenders" (i.e. Bank of America).

- FGMK prepared a multi-page Schedule of Calculations, included in its workpapers, which related to the Knight Entities' "Compliance with Covenants" and referencing the specific sections of the Loan Agreements setting forth the relevant financial covenants.

- FGMK's 2007 audit workpapers included copies of the Amended and Restated Loan and Security Agreement dated as of February 14, 2006, in which section 9.7 Financial Statements states that the Borrower shall furnish to Bank of America as soon as available a copy of the annual audited consolidated financial statements of the Borrower.

- The 2007 financial statements and audit report referenced the "loan and security agreement" with Bank of America, as well as the relevant financial covenants.

117. Likewise, FR&R expressly acknowledged the intent of its 2005 and 2006 audits and purpose of its report for those same fiscal years was in support of the Knight Entities' debt requirements. Specifically:

- In FR&R's "Engagement Acceptance Form," dated December 31, 2006, FR&R stated in the item requesting "Use of FR&R reports" that it was to be used for "Debt."

- In the workpapers entitled, "2006 Audit Program for Notes Payable and Long-term Debt," FGMK notes that "[t]he Company has received the waiver for loan covenants for the year ended 12/31/06 due to Marrero shut down."

- In the 2005 Audit Planning Memo, FR&R opines that "it does not appear that there are any loan covenant compliance issues."

- FR&R's 2006 audit workpapers included copies of the Amended and Restated Loan and Security Agreement dated as of 2/14/06, in which section 9.7 Financial Statements states that the Borrower shall furnish to Bank of America as soon as available a copy of the annual audited consolidated financial statements of the Borrower.

- The financial statements for fiscal year-end 2005 and 2006 referenced the Loan Agreements with specific citations to the relevant financial covenants.

118. Notwithstanding the Auditor Defendants' professional obligations of independence and due care, and further notwithstanding what the Auditor Defendants knew or should have known regarding the Knight Entities' senior management, operations and controls at the time they were conducting the audits for fiscal years 2005 through 2007, the Auditor Defendants failed to conduct the audits and other services in accordance with either relevant professional standards or contractual commitments to the Knight Entities, and to Bank of America who the Auditor Defendants knew and expressly acknowledged was relying on the integrity of the audit process and the accuracy of the financial reports to loan additional funds and to continue to extend credit to the Knight Entities.

119. As a result of the Audit Defendants' failure, the Knight Entities' deteriorating financial condition over the years 2005 through 2008 remained hidden from Bank of America until at least April 2009 when Knight Industries and Knight Celotex filed for bankruptcy. It was not until after the Trustee and Receiver were appointed in June 2009 that Bank of America began to discover that, contrary to the Auditor Defendants' audit opinions, the financial statements of the Knight Entities did not fairly present the financial position of the companies or the results of their operations and cash flows at December 31, 2005, December 31, 2006 and December 31,

2007. In fact, the audited financial statements for the fiscal years 2005, 2006 and 2007 contained material errors and were false and misleading, which should have and would have been discovered and disclosed if not for the audit failures set forth below.

### D. THE AUDITOR DEFENDANTS' AUDIT FAILURES AND VIOLATIONS OF AUDITING STANDARDS.

120. In conducting their audits of the Knight Entities for each of the fiscal years 2005, 2006 and 2007, the Auditor Defendants failed to exercise the care, good faith and prudence required of an independent auditor. The audit failures detailed below resulted in the auditors' failure to detect and propose appropriate adjustments to correct the material errors and misstatements in Knight Industries' financial statements.

121. For each of the audits for the fiscal years 2005, 2006 and 2007, the Auditor Defendants, in the conduct of their audits, made material departures and deviations from "auditing standards generally accepted in the United States," including the standards approved and adopted by the American Institute of Certified Public Accountants ("AICPA") as set forth as GAAS and Statements on Auditing Standards (codified as AU sections), which are recognized by the AICPA as the Institute's interpretations of GAAS.

### PLANNING, STAFFING AND PERFORMING THE AUDITS

122. In planning, staffing and performing their audits for fiscal years 2005 through 2007, AU Section 150 states that auditors should, at a minimum, comply with the following standards in order to ensure their audits are in conformance with GAAS:

a. General Standards:

(i) The auditor must have adequate technical training and proficiency to perform the audit;

(ii) The auditor must maintain independence in mental attitude in all matters relating to the audit; and

          (iii)     The auditor must exercise due professional care in the performance of the audit and the preparation of the report.

    b.     Standards of Field Work:

          (i)     The auditor must adequately plan the work and must properly supervise any assistants.

          (ii)     The auditor must obtain a sufficient understanding of the entity and its environment, including its internal control, to assess the risk of material misstatement of the financial statements whether due to error or fraud, and to design the nature, timing, and extent of further audit procedures.

          (iii)     The auditor must obtain sufficient appropriate audit evidence by performing audit procedures to afford a reasonable basis for an opinion regarding the financial statements under audit.

    c.     Standards of Reporting

          (i)     The auditor must state in the auditor's report whether the financial statements are presented in accordance with generally accepted accounting principles.

          (ii)     The auditor must identify in the auditor's report those circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period.

          (iii)     When the auditor determines that informative disclosures are not reasonably adequate, the auditor must so state in the auditor's report.

          (iv)     The auditor must either express an opinion regarding the financial statements, taken as a whole, or state that an opinion cannot be expressed, in the auditor's report. When the auditor cannot express an overall opinion, the auditor should state the reasons therefor in the auditor's report. In all cases where an auditor's name is associated with financial statements, the auditor should clearly indicate the character of the auditor's work, if any, and the degree of responsibility the auditor is taking, in the auditor's report.

123.    Notwithstanding the foregoing standards, with which the Auditors were professionally and contractually obligated to comply, the Auditor Defendants violated such

provisions, thereby constituting audit failures, by among other things, failing adequately to plan the work or to properly modify or tailor their audit plans to account for identified risks.

124.    For example, for the fiscal year 2006 audit, FR&R noted in its workpapers that the valuation of inventory and the associated valuation reserve were significant audit areas.  A General Audit Engagement Checklist notes that inventories are a "complex or troublesome engagement area[]."  Additionally, advances to and investments in partially owned affiliates was identified as "[an]other significant high-risk area []."

125.    Notwithstanding these identified risks, FR&R failed to perform tests to substantiate the balances of the inventory reserve and the advances to and investments in partially owned affiliates, and further failed to appropriately document the audit work performed.

126.    In the fiscal year 2007 audit workpapers, FGMK noted in its assessment of risks related to financial reporting that "the accounting staff is not particularly strong in GAAP knowledge" and that there is "high turnover in the accounting department as they appear to be overburdened."  FGMK further noted that "not all employees appeared to be fully competent or properly trained in their jobs due to the large turnover in the department."  Additionally, FGMK noted in its assessment of internal controls that "[t]here has been large turn over in the accounting department that has attributed to [a] backlog of unprocessed transactions."

127.    Having identified these risks in fundamental internal controls and competency, FGMK nevertheless failed to adequately plan its work or modify its audit plan to assess the risk of resulting material misstatements of the financial statements and/or to obtain sufficient, appropriate audit evidence to support its opinions and conclusions.  Instead, FGMK merely arrived at the following conclusions without explanation or any documented basis:  "This

problem should be alleviated as their [sic] are new staff and personnel on the job who will become more experienced in their roles as time passes."

128.     Additionally, in the workpapers for the fiscal year 2007 audit, FGMK noted that Knight has "been experiencing cash shortages and that they have had to pay off some of their vendors with credit cards."  FGMK further noted, "[d]ue to the cash flow shortages encountered by the firm, there has been a hold to pay the regular operating bills unless it is vital to the operations of the firm (i.e.: shipping & utilities)."   Notwithstanding these noted risks and deficiencies, FGMK decided not to report these matters or note these risks, concluding without basis, "Internal control deficiencies are not reported since the employees are still learning the processes."

### GOING CONCERN DISCLOSURES

129.     Given FGMK's discovery of these risks during the course of its 2007 audit and the significance of the information, it should have conducted specific procedures to analyze the Knight Entities' ability to continue as a going concern and it should have added cautionary disclosures related to its substantial doubt about the Knight Entities' ability to continue as a going-concern in its 2007 audit report.

130.     AU Section 341 states that an "auditor has a responsibility to evaluate whether there is substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time."  Examples of conditions or events that may present substantial doubt regarding an entity's ability to continue as a going concern include negative trends such as working capital deficiencies, financial difficulties such as default on loans, and the need to significantly revise operations.  All such conditions were noted by FGMK during its audit.

131.    AU Section 341 further states that if conditions exist that objectively raise substantial doubt about the entity's ability to continue as a going concern, "[i]t may be necessary to obtain additional information about such conditions and events, as well as the appropriate audit evidence to support information that mitigates the auditor's doubt."  Finally, if the auditor concludes that substantial doubt exists, it should (1) consider the adequacy of disclosure about the possible inability to continue as a going concern for a reasonable period of time, and (2) include an explanatory paragraph in his audit report to reflect its conclusion.

132.    FGMK's workpapers contained two going concern checklists, which identified numerous conditions and events that objectively caused substantial doubt about the ability of the Knight Entities to continue as a going concern, including but not limited to (i) "cash flow shortages and the temporary shut down of a plant"; (ii) management plans to "lay off workers in Lisbon Falls and shutting down of product line"; (iii) "plant closure temporarily and delaying of all vendor payments"; (iv) the company was "slow in paying off its vendors and that they temporarily closed one of their plants"; (v) the company has "been paying the minimum monthly payments to the vendors"; and (vi) the "Company closed down a plant temporarily and opened it back up with limited personnel and reengineered the plant to produce a different product segment."

133.    Notwithstanding the foregoing, FGMK did not address the identified going concern risks in accordance with the foregoing provisions and the standards mandated under GAAS.  While FGMK noted in its workpapers that it would conduct additional inquiries and analytics to determine whether appropriate disclosures or explanations should be included in the Knight Entities' financial statements regarding its ability to continue as a going concern, there is

no documentation in the workpapers or otherwise that any additional procedures, inquiries or analytics were ever performed.

134.     Had these risks been identified and further testing performed, as required, Bank of America would have been alerted to the precarious and deteriorating financial position of the Knight Entities and been able to take steps to avoid and mediate the substantial losses it incurred as a result of the Knight Entities' bankruptcy.

### STAFFING AND SUPERVISING AUDITS

135.     The Auditor Defendants also failed to properly staff and supervise the engagement.  For example, for the fiscal year 2006 audit, FR&R's workpapers included a "Supervision, Review and Approval Form," which required that the engagement partner sign-off as having completed a critical list of tasks.  However, the workpaper was never signed by the audit partner as having been completed.  Those tasks included, among others:

> (i)     Reviewed the planning documents and attested to his/her satisfaction with the sufficiency of the audit programs;

> (ii)     Reviewed the completed audit programs and attested to his/her satisfaction that the audit, as evidenced by the workpapers reviewed by the partner, was conducted in accordance with generally accepted auditing standards;

> (iii)     Reviewed the financial statements and attested to his/her satisfaction that the statements meet accepted standards of presentation and disclosure and that the statements were prepared in conformity with generally accepted accounting principles consistently applied; and

> (iv)     Communicated to the engagement team the importance of exercising professional skepticism and independently ascertained that there was appropriate communication with the engagement team throughout the audit regarding information or conditions that indicate risks of material misstatement due to fraud.

136.    Additionally, for the fiscal year 2007 audit, FGMK's "Engagement Acceptance Form" included the following question: "Do firm personnel lack the necessary competence and capabilities to serve the client, including any specialized industry, regulatory, or reporting requirement knowledge?"  FGMK checked "Yes" without further explanation of how the firm's lack of necessary competence and capabilities would be addressed, if at all.

137.    Had the Auditor Defendants appropriately planned and supervised their audits and modified the audit plans and procedures to account for the identified risks noted above, among others, the Auditor Defendants would have and should have detected and proposed adjustments to correct the material misstatements in the financial statements for each of the fiscal years 2005, 2006 and 2007.

138.    Had such material misstatements been detected, noted and corrected, as required, Bank of America would have been alerted to the precarious and deteriorating financial position of the Knight Entities and been able to take steps to avoid and mediate the substantial losses it incurred as a result of the Knight Entities' bankruptcy.

### RELATED PARTIES

139.    Additionally, AU Section 334 ("Related Parties") provides guidance on procedures that should be followed by auditors when performing an audit in accordance with GAAS to identify related party relationships and transactions and to ensure compliance with the financial statement accounting and disclosure requirements.  For example:

    a.    Paragraph 6 states that "In the absence of evidence to the contrary, transactions with related parties should not be assumed to be outside the ordinary course of business.  The auditor should, however, be aware of the possibility that transactions with related parties may have been motivated solely, or in large measure, by conditions similar to the following:  a. Lack of sufficient working capital or credit to continue the business...."

b.      Paragraph 7 includes specific audit procedures for the auditor to perform to determine the existence of related parties, such as evaluating the company's procedures for identifying and properly accounting for related party transactions, requesting from appropriate management personnel the names of all related parties and inquiring whether there were any transactions with these parties during the period.

c.      Paragraph 9 states that "After identifying related party transactions, the auditor should apply the procedures he considers necessary to obtain satisfaction concerning the purpose, nature, and extent of these transactions and their effect on the financial statements.  The procedures should be directed toward obtaining and evaluating sufficient appropriate audit evidence and should extend beyond inquiry of management."  Paragraph 9 further provides a list of procedures that the auditor should consider, such as obtaining an understanding of the business purpose of the transaction and examining source documents and agreements.

d.      Paragraph 10 further states that "When necessary to fully understand a particular transaction, the following procedures, which might not otherwise be deemed necessary to comply with generally accepted auditing standards, should be considered."  One of the listed procedures states that "With respect to material uncollected balances, guarantees, and other obligations, obtain information about the financial capability of the other party or parties to the transaction.  Such information may be obtained from audited financial statements, unaudited financial statements, income tax returns, and reports issued by regulatory agencies, taxing authorities, financial publications, or credit agencies.  The auditor should decide on the degree of assurance required and the extent to which available information provides such assurance."

e.      Paragraph 11 states that for each material related party transaction, the auditor should satisfy himself that it is adequately disclosed in the financial statements.

140.    Furthermore, AU Section 9334 ("Related Parties: Auditing Interpretations of Section 334"), Item 6, addresses the nature and extent of auditing procedures for examining related party transactions.  Specifically:

a.      Paragraph 18 states that "The risk associated with management's assertions about related party transactions is often assessed as higher than for many other types of transactions because of the possibility that the parties to the transaction are motivated by reasons other than those that exist for most business transactions"; and

   b.   Paragraph 19 states that "The higher the auditor's assessment of risk regarding related party transactions, the more extensive or effective the audit tests should be. *For example, the auditor's tests regarding valuation of a receivable from an entity under common control might be more extensive than for a trade receivable of the same size because the common parent may be motivated to obscure the substance of the transaction…..*"

141.   Notwithstanding the standards imposed by GAAS and as further explained under AU Sections 150, 334 and 9334 – standards with which the Auditors were professionally and contractually obligated to comply – the Auditor Defendants violated such provisions by failing properly to identify related parties and related-party transactions, and test the balances of any such transactions and assess them for .

142.   For example, for the fiscal years 2005 and 2006 audits, FR&R's workpaper, General Auditing and Completion Procedures, includes procedures related to reviewing related-party transactions, including a requirement that it identify known related parties and related-party transactions.   Notwithstanding this requirement and the number and complexity of the Knight Entities' related companies and affiliates, the overlapping management and membership interests by various related individuals (including, but not limited to, the Knight Insiders), and the numerous related entities owned and/or controlled by the Knight Insiders, FR&R listed only "Knight Rickett, [sic] LLC" as the only known related party.

143.   FR&R's General Auditing and Completion Procedures further required it to "[i]nquire of the owner/manager about the existence of related party transactions." Notwithstanding, FR&R failed to properly conduct these inquiries and failed to appropriately document in the workpapers any inquiries of management related to the existence of related parties and related-party transactions.

144.    Notwithstanding the standards imposed by GAAS, which FR&R was professionally and contractually obligated to follow, FR&R failed to identify The Wauregan Company, a company wholly-owned by James Knight, as a related party and further failed to identify all of the members with ownership interests as related parties.  Had FR&R properly identified these individuals and entities as related parties, they would have and should have performed additional procedures to ensure that the material transactions with these individuals and entities were properly disclosed and accounted for in the financial statements.

145.    Specifically, FR&R would have and should have discovered that Knight Industries incurred expenses related to The Wauregan Company during fiscal years 2005 and 2006 that exceeded FR&R's planning materiality threshold for each respective fiscal year, and that these transactions were not properly disclosed in the financial statements at December 31, 2005 and December 31, 2006.  As such, the financial statement disclosures were not properly presented in accordance with GAAP.

146.    For the fiscal year 2007 audit, FGMK's Audit Program included procedures that were to be followed for reviewing related-party transactions, including the identification of known related parties and related-party transactions.  FGMK's Audit Program further required it to "[i]nquire of management about the existence of related parties and related-party transactions."

147.    Notwithstanding, FGMK failed to properly follow its procedures and further failed to appropriately document in the workpapers any inquiries of management related to the existence of related parties and related-party transactions.

148.    Furthermore, despite the number and complexity of the Knight Entities' related companies and affiliates, the overlapping management and membership interests by various

related individuals (including, but not limited to, the Knight Insiders), and the numerous related entities owned and/or controlled by the Knight Insiders, FGMK listed only Knight Premium Flooring (n/k/a KQF) and "Rickett [sic] China" (n/k/a KQF-China) as related parties.

149.    Notwithstanding the standards imposed by GAAS, which FGMK was professionally and contractually obligated to follow, FGMK failed to identify The Wauregan Company, a company wholly-owned by James Knight, as a related party and further failed to identify all of the members with ownership interests as related parties.  Had FGMK properly identified The Wauregan Company and the other related individuals and entities as related parties, they would have and should have performed additional procedures to ensure that material transactions with these individuals and entities were properly disclosed and accounted for in the financial statements.

150.    Among other things, FGMK should have discovered that Knight Industries incurred expenses during 2007 related to alleged services by The Wauregan Company in an amount exceeding the amount of FGMK's audit materiality threshold, and that these related party transactions were not properly disclosed in the financial statements.  As such, the financial statement disclosures were not presented in accordance with GAAP.

151.    Additionally, in each of the fiscal year 2005, 2006, and 2007 audits, the Auditor Defendants failed to obtain evidence to test the Advances to and Investments in Partially Owned Affiliates and as such, did not properly test these balances for impairment as necessary to provide an opinion on the financial statements' conformance with GAAP.

152.    Specifically, in the fiscal year 2005 and 2006 audits, FR&R failed to conduct proper testing of the balances recorded for Advances to Partially Owned Affiliates, most notably for advances made from Knight Industries to KQF (the "KQF Receivable") and to KQF-Global

("KQF Global Receivable"). Instead, FR&R simply accepted the balances recorded by the Knight Entities' management on the books of Knight Industries and KQF and failed to rigorously investigate and analyze the recorded balances as required under GAAS. Nor did the FR&R attempt to analyze or reconcile the differences in the reported balances between the Knight Industries and the KQF financial statements, which reflected difference of $371,942, or approximately 15%, in the amounts due from KQF. The materiality threshold for FY05 set by FR&R was $360,000.

153. Similarly, the amount recorded as due on the KQF-Global Receivable on Knight Industries' financial statement for fiscal year 2006 was $101,809, but FR&R's workpapers showed a balance due of ($154,608), a difference of $256,417. In fact, the fiscal year 2006 audit workpapers note that "Global Rikett has made some unusual adjustments which need to be reversed. Due to these unusual adjustments in Global, the intercompany balances does [sic] not tie." Notwithstanding this noted exception and the red flag it raised of improper accounting by the Knight Entities, FR&R failed to further test these recorded receivable and/or payable balances or to obtain evidence to support the amounts recorded in the financial statements. Furthermore, the noted exceptions were not disclosed in the Knight Entities' financial statements or in FR&R's report.

154. FR&R further failed to perform any audit procedures to assess the collectability of the KQF Receivable or the KQF-Global Receivable, and failed to consider whether those assets were impaired as of December 31, 2005 and December 31, 2006.

155. For the fiscal year 2007 audit, FGMK similarly failed to perform any audit procedures to assess the collectability of the KQF Receivable or the KQF-Global Receivable and further failed to conduct any impairment analysis of the Receivables. For instance, the Knight

Industries 2007 audit report reflects a balance/receivable owed from KQF of $3,467,223. However, the KQF 2007 audit report reflects a debt owed to Knight Industries of only $2,995,980, a difference of $471,243. FGMK failed to identify or explain this difference or include any record of independent analysis or testing of the true value of the Receivables.

156. There also are discrepancies in the amounts reported for advances from Knight Industries to other affiliated entities, such as KQF-Global and KQF-China. FGMK failed to test and failed to include proper documentation related to these discrepancies. Thus, the audit workpapers fail to include proper audit evidence to support the amounts included within the financial statements.

### INVENTORY, SALES AND ACCOUNTS RECEIVABLE

157. Additionally, AU Section 342 ("Auditing Accounting Estimates") provides technical guidance on auditing accounting estimates, such as those relating to inventory testing and valuation, and procedures designed to test other significant accounting estimates. For example, Paragraph 4 states: "The auditor is responsible for evaluating the reasonableness of accounting estimates made by management in the context of the financial statements taken as a whole. As estimates are based on subjective as well as objective factors, it may be difficult for management to establish controls over them. *Even when management's estimation process involves competent personnel using relevant and reliable data, there is potential for bias in the subjective factors. Accordingly, when planning and performing procedures to evaluate accounting estimates, the auditor should consider, with an attitude of professional skepticism, both the subjective and objective factors*."

158. Despite noting that the Knight Entities' accounting staff was "not particularly strong in GAAP knowledge," did not "appear[] to be fully competent or properly trained," and

that there was "high turnover" among the accounting staff, the Auditor Defendants did not plan and perform their audits with the attitude of professional skepticism required and did not appropriately plan the audit to accommodate these noted deficiencies or perform additional procedures to ensure the competency risks noted were properly evaluated and tested.

159. AU Section 342 also provides that the "auditor's objective, among others, when evaluating estimates is to obtain sufficient evidence that the accounting estimates are reasonable in the circumstances." "In evaluating the reasonableness of an estimate, the auditor normally concentrates on key factors and assumptions that are (i) significant to the accounting estimate; (ii) sensitive to variations; (iii) deviations from historical patterns; and (iv) subjective and susceptible to misstatement and bias. The auditor normally should consider the historical experience of the entity in making past estimates as well as the auditor's experience in the industry. However, changes in facts, circumstances, or entity's procedures may cause factors different from those considered in the past to become significant to the accounting estimate." "In evaluating reasonableness, the auditor should obtain an understanding of how management developed the estimate. Based on that understanding, the auditor should use one or a combination of the following approaches:

> (i)     Review and test the process used by management to develop the estimate.
>
> (ii)    Develop an independent expectation of the estimate to corroborate the reasonableness of management's estimate.
>
> (iii)   Review subsequent events or transactions occurring prior to the date of the auditor's report."

160. Paragraph 11 of AU Section 342 outlines several procedures that the auditor may consider when assessing the reasonableness of management's accounting estimate. These include: identifying controls over preparation of estimates, identifying the sources of data that management used and determining whether those sources are relevant and reliable, analyzing

historical data and considering whether changes in the business or industry may cause other factors to become significant. Paragraph 16 provides numerous examples of accounting estimates, among which include uncollectible receivables and obsolete inventory.

161. Notwithstanding the standards imposed by GAAS and as further explained under AU Sections 150 and 342 – standards with which the Auditors were professionally and contractually obligated to comply – the Auditor Defendants failed adequately to design the nature, timing, and extent of audit procedures and/or properly perform further audit procedures related to inventory.

162. For example: for the fiscal year 2006 audit, FR&R identified inventory and its associated valuation reserve as risk areas. However, FR&R failed to perform any additional or extended procedures as part of the inventory audit and the "Audit Program for Inventory" noted only "basic procedures" as having been completed. Further, the documents show that testing of the valuation allowance was not completed.

163. For the fiscal year 2007 audit, FGMK's workpapers identified the following audit areas as containing a fraud risk or other significant risk: (1) receivables/sales; (2) inventory/cost of sales; (3) income/expense. FGMK's workpapers stated that "FGMK will perform the required extended steps for the inventory and sales audit areas…." However, in FGMK's Risk Assessment Summary Form, only the receivables/sales audit area is identified as a significant risk, and only the receivables/sales audit approach identifies that extended audit procedures will be performed. FGMK inexplicably decided not to include the inventory and cost of sales audit areas as significant risk areas and the audit approach shows that only basic procedures were performed, which is inconsistent with FGMK's workpapers, its noted procedures and the

requirements of GAAS and AU Sections 150 and 342. This audit failure resulted in, among other things, inventory being materially misstated in the financial statements.

164. The Auditor Defendants further violated the standards imposed by GAAS, as further explained under AU Sections 150 and 342, by failing to properly design procedures to test the significant accounting estimates.

165. For example: for fiscal years 2005 and 2006, FR&R's Audit Program for Inventory included an audit procedure to "[d]etermine whether allowances have been made for scrap, obsolete, unsalable, slow-moving, or overstocked items," and further included detailed sub-procedures related to this step. However, there is no reference or documentation of these procedures being performed or followed and the audit programs did not include a reference to any audit workpapers reflecting that such procedures were performed.

166. FGMK's 2007 audit workpapers contain two "Significant Estimates Identification Checklists," one dated August 27, 2008 and the other dated October 20, 2008. Both forms ask whether inventory valuation allowances are applicable to the financial statements and, on both forms, the column is checked "No." Inventory valuation allowances, however, are applicable to the financial statements of any company that has inventory. FGMK should have identified that inventory valuation reserves are applicable to the financial statements of the Knight Entities, and as such, should have performed appropriate procedures to determine that the reserves were properly recorded. As FGMK failed to test inventory reserves for slow-moving, obsolete or unsalable items, FGMK failed to perform its responsibilities in accordance with GAAS.

167. Additionally, for fiscal years 2005, 2006, and 2007, the Auditor Defendants failed to perform appropriate audit procedures to test that inventory was properly recorded at lower of cost or market.

168.     For example, in the 2006 audit, FR&R included an account entitled, "Lower or [sic] cost or market reserve," which reflects a positive balance, which in turn, *increased* the total inventory balance reported on the Knight Entities' 2006 financial statements.  This entry is in contravention of ARB 43, Chapter 4, Paragraph 8, which states that inventories must be priced at cost or market, *whichever is lower*.  Thus, it was a violation of GAAP to allow this adjustment to result in a write-up of the inventory balance.  FR&R failed to obtain appropriate evidence to test this account balance and failed to include appropriate documentation in the workpapers addressing why the reserve account was not properly accounted for in accordance with GAAP.

169.     Furthermore, for each of the fiscal year 2005 through 2007 audits, the Auditor Defendants failed or neglected to obtain sufficient, appropriate audit evidence to be able to draw reasonable conclusions on which to base the opinion contained in their audit reports, thereby further violating the standards mandated by GAAS, specifically those contained in AU Section 150, General Standard Nos. 2 and 3 and Standards of Fieldwork No. 3.

170.     For example, the Auditor Defendants failed to develop independent expectations in the development of each Auditor Defendant's analytical procedures in performing their audits of, and rendering their opinions regarding, the Knight Entities' financial statements for fiscal years 2005, 2006, and 2007.  Specifically, Paragraph 17 of AU 329 instructs that the expectation be precise enough such that material misstatements would be identified for the auditor to investigate.

171.     Notwithstanding, for fiscal year 2005, FR&R's inventory price testing for raw materials compared costs per the stock status report to costs per the purchase invoice.  However, FR&R calculated no thresholds for purposes of identifying or investigating material misstatements and provided insufficient and unsubstantiated explanations for the noted

differences. For 2006, FR&R again calculated no thresholds for purposes of identifying or investigating material misstatements and provided no conclusions or explanations for the noted differences.

172. For certain finished goods inventory testing, FR&R compared the cost amount per the Stock Status Report to the amount per the Cost Reports or Cost Cards, all of which are Knight Industries prepared documents, rather than comparing amounts to independent sales invoices or otherwise performing independent analysis of the inventory calculations.

173. For fiscal year 2005, FR&R failed to properly complete its finished goods inventory price testing by omitting any evidence of testing for the Lisbon Falls plant, which accounted for approximately 35% of total finished goods for Knight Industries. FR&R also did not test the raw materials at Lisbon Falls, which accounted for approximately 28% of total raw materials for Knight Industries.

174. For the fiscal year 2007 inventory overhead testing, FGMK merely compared the 2007 amounts to the 2006 amounts and concluded that the overhead rates "appear reasonable." FGMK, however, developed no independent expectations and calculated no independent thresholds for purposes of identifying or investigating material misstatements.

175. FGMK also failed to properly test and evaluate the audit evidence obtained. Specifically, of the $1,505,591 of inventory tested by FGMK, approximately $639,250 or 42% did not have sales within six months of the testing date. In fact, one inventory sample tested had not been produced or sold in over two years, yet no exceptions or markdowns were taken or noted. Had FGMK properly evaluated the audit evidence, it would have concluded that the inventory reserve was materially understated in excess of $1 million at December 31, 2007 and, therefore, the financial statements did not comply with GAAP.

176.     Furthermore, despite the numerous inventory-related issues and deficiencies specifically noted by FGMK in its workpapers, FGMK failed to conduct proper testing of the basic inventory counts and calculations provided by the Knight Entities' employees and management.  For instance, FGMK noted that "the client used old, unused tags from the previous 4 or 5 inventories" and as such, FGMK was not able to obtain from the Knight Entities sufficient information to properly evaluate the sufficiency and appropriateness of these key inventory variables.  Notwithstanding, FGMK did not conduct any further follow up or testing to verify the physical inventory figures.

### IMPLAUSIBLE RELATIONSHIPS

177.     Additionally, in each of the audits for fiscal years 2005, 2006, and 2007, contrary to GAAS and the relevant interpretive guidance, the Auditor Defendants failed to provide explanations and/or substantiation of implausible relationships.   Although the Auditor Defendants performed certain analytical procedures and made some inquiries, the Auditor Defendants each failed to develop expectations based on plausible relationships and failed to exercise professional skepticism in inquiring about unusual and significant transactions  The Auditor Defendants further relied upon analytical review comparisons that yielded no meaningful relationships and most variances in the preliminary and final analytics for balance sheet and income statement accounts are lacking any explanation and/or contain anecdotal explanations "from management" that are not further or independently substantiated by the Auditor Defendants.

178.     For example, in the 2005 preliminary analytics, FR&R fails to provide any explanation for the change in sales of approximately $10.8 million from the prior year.  In the 2005 final analytics, FR&R provides inadequate substantiation of the change in the revenue

account balance, which increased approximately $8.7 million from prior year. The only explanation noted by FR&R for the substantial and material variance is that the balance "[i]ncreased due to Danville plant started production and saled [sic] during the year. There was a loss of sales at Marrerro [sic] for last quarter of 2005. But the sales to Marrerro [sic] customers were catered to by company's other plants." There is no substantiation of this explanation or source for the information. Nor is there any evidence that independent testing or substantiation of this information was conducted by FR&R.

179. For several asset accounts in the 2005 preliminary analytical analysis, including inventories which increased approximately $2.1 million or 22% from the prior period, the variance explanation is "FR&R will inquire about the increase/(decrease) in all these assets and verify the balances on test basis to agree with supporting documents." Once again, however, there is no explanation or analysis for these variances. The workpapers reflect only general, anecdotal accounts from conversations with unnamed management. FR&R conducted no independent analysis or substantiation of the accounts.

180. In the 2005 year-end final analytical analysis, in which inventories increased approximately $4 million or 42% from the prior period, the analysis references the inventory leadsheet for further explanation, which merely includes the explanation that "based on discussion with the controller, the increase is due to heavy production in the last week of December in anticipation of sales, but due to Christmas holidays, each plant could not dispatch the finished goods." Again, there is no adequate or independent verification or analysis for the substantial and material variances.

181. Additionally, the fiscal year 2005 inventory leadsheet included a calculation of the inventory turnover ratio that reflected an increase from 22.66 days in 2004 to 34.46 days in

2005, or 52%. Once again, however, there is no further explanation for the change in this ratio, no conclusions were reached by FR&R, and FR&R conducted no independent analysis or additional testing of the inventory aging or calculation.

182.  For several asset accounts in the 2006 preliminary analytical analysis, including inventories which increased approximately $2.2 million or 16% from the prior period, the variance explanation is "FR&R will inquire about the increase/ (decrease) in all these assets and verify the balances on test basis to agree with supporting documents." However, FR&R failed to conduct any independent analysis or substantiation to verify the balances and failed to provide any independent explanation or analysis for these variances. Instead, once again, the workpapers simply reflect that FR&R had certain "conversations" – the substance of which is not detailed – with management.

183.  For fiscal year 2007, FGMK's preliminary analytics contains the following conclusory explanation for the change in cost of sales, which decreased approximately $13.2 million from the prior fiscal year: "FGMK expects the COS to decrease and to correlate with the decrease in sales from the slumping economy and the rising cost of materials." There is no independent substantiation of this explanation or evidence of further testing of this conclusion. Additionally, in the Final Analytics worksheet, the explanation for the change in the cost of sales balance is based solely on "discussions with management" and is not further or independently substantiated.

184.  For fiscal year 2007, FGMK's preliminary analytics contains the following conclusory explanation for the change in sales, which decreased approximately $12.1 million or 12.6% from the prior fiscal year:  "FGMK expects the sales to decrease due to the weakened housing economy as there was significantly less housing development within the calendar year.

FGMK will test the income statement balances analytically and test for cut off to ensure proper reporting." Notwithstanding those planned procedures, there is no independent substantiation of this explanation or evidence of further testing of this conclusion. Additionally, in the Final Analytics worksheet, the explanation for the change in sales is not adequate and is unsubstantiated.

185. In each of the audits for fiscal years 2005, 2006 and 2007, the Auditor Defendants also failed to evaluate the sufficiency and appropriateness of the audit evidence obtained in violation of GAAS.

186. Specifically, in the fiscal year 2005 audit planning memo, FR&R states, "it does not appear that there are any loan covenant compliance issues." AICPA Professional Standards require that there be a record of audit procedures performed and relevant audit evidence obtained in reaching such conclusions. However, FR&R failed to include appropriate supporting documentation in the workpapers to support the conclusion it reached regarding the loan covenants.

187. Additionally, the 2005 Audit Program for Notes Payable and Long-term Debt states there are no restrictive loan covenants. However, the 12/31/05 financial statements Notes Payable footnote states that "The Loan and Security Agreement contains various customary financial and affirmative and negative covenants." Again, FR&R failed to include appropriate supporting documentation in the workpapers to support the conclusion reached.

188. FR&R's 2006 Audit Program for Notes Payable and Long-term Debt states that "[t]he Company has received the waiver for loan covenants for the year ended 12/31/06 due to Marrero shut down." The Audit Program does not include a workpaper reference for a copy of the bank waiver or other work performed to substantiate that the Company, in fact, received a

waiver. FR&R did not perform any independent testing of Knight Industries' compliance with the loan covenants. This was particularly unreasonable given FR&R's knowledge that Bank of America was relying on its audit and its unqualified opinion.

189. As a result of the numerous risks, deficiencies and red flags detailed above, the Auditor Defendants failed to comply with AU 318 ("Performing Audit Procedures in Response to Assessed Risks and Evaluating the Audit Evidence Obtained") and AU 326 (Audit Evidence), which provide the controlling guidance for auditors on procedures that should have been followed and evidence that should have been obtained by the Auditor Defendants. Specifically:

    a.    Paragraph 70, states: "Based on the audit procedures performed and the audit evidence obtained, the auditor should evaluate whether the assessments of the risks of material misstatement at the relevant assertion level remain appropriate."

    b.    Paragraph 77 states that "The auditor should document:

        (i)    The overall responses to address the assessed risks of misstatement at the financial statement level

        (ii)    The nature, timing, and extent of the further audit procedures

        (iii)    The linkage of those procedures with the assessed risks at the relevant assertion level

        (iv)    The results of the audit procedures

        (v)    The conclusions reached with regard to the use in the current audit of audit evidence about the operating effectiveness of controls that was obtained in a prior audit"

    c.    Appendix A1, includes illustrative financial statement assertions and examples of substantive procedures for inventories of a manufacturing company, such as the Knight Entities. An example of a valuation and allocation assertion is that "Slow-moving, excess, defective, and obsolete items included in inventories are properly identified." The corresponding examples of substantive procedures that then should be employed are as follows:

        (i)    Examining an analysis of inventory turnover;

        (ii)    Analyzing industry experience and trends;

        (iii)    Analytically comparing the relationship of inventory balances to anticipated sales volume;

      (iv)      Walk-through of the plant for indications of products not being used;

      (v)      Inquiring of production and sales personnel concerning possible excess, or defective or obsolete inventory items;

      (vi)      Logistic and distribution business process (e.g., cycle time, volume of returns, or problems with suppliers).

    d.      Appendix A1 also includes an example of a valuation and allocation assertion that "Inventories are reduced, when appropriate, to replacement cost or net realizable value." The corresponding examples of substantive procedures that then should be employed are as follows:

      (i)      Inspecting sales catalogs or industry publications for current market value quotations.

      (ii)      Recalculation of inventory valuation reserves.

      (iii)      Analyzing current production costs.

      (iv)      Examining sales after year end and open purchase order commitments.

190. Had the Auditor Defendants conducted their audits in conformance with GAAS and issued proper opinions on the Knight Entities' financial statements for fiscal years 2005, 2006 and 2007, and/or had the Auditor Defendants timely, adequately and appropriately disclosed reportable conditions in accordance with both GAAS, GAAP, and their own commitments as evidenced in their engagement letters, Bank of America (i) would not have continued to loan money and increase the lines of credit to Knight Industries and KQF, (ii) could have and would have taken corrective action to halt the spiraling decline of Knight Industries, Knight Celotex, and KQF, and/or (iii) could have and would have taken possession of the Knight Entities sooner so as to have maximized value for the entities and lessened the substantial shortfall that exists today.

### COUNT I: *PROFESSIONAL NEGLIGENCE*

### *AGAINST THE AUDITOR DEFENDANTS ONLY*

191. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 192 with the same force and effect as if fully set forth herein.

192.     The Auditor Defendants each owed a duty to bring to and to exercise in the auditing and accounting function that degree of skill and care possessed in the auditing and accounting profession generally.  Included within that duty was an obligation to observe GAAP and GAAS in performing the audits and in rendering their opinions on the financial statements of Knight Industries and the covered Knight Entities.

193.     In auditing the financial statements of the Knight Entities for the fiscal years 2005 and 2006, FR&R breached its duties and was guilty of professional negligence in at least the following respects:

      a.     For each of fiscal years 2005 and 2006, had FR&R exercised due professional care, it would have identified that the financial statements were not compliant with GAAP and materially misstated for reasons other than the KQF non-consolidation;

      b.     For each of fiscal years 2005 and 2006, FR&R knew or should have known that the opinions, as issued, were not appropriate and did not comply with professional standards and/or their professional obligations as independent auditors of the Knight Entities;

      c.     For each of fiscal years 2005 and 2006, FR&R should have disclosed in its reports on the financial statements of the Knight Entities that said statements were not prepared in accordance with GAAP for reasons other than the non-consolidation of KQF;

      d.     For each of fiscal years 2005 and 2006, FR&R failed to disclose "reportable conditions" of which FR&R was or should have been aware;

194.     In auditing the financial statements of the Knight Entities for fiscal year 2007, FGMK breached its duties and was guilty of professional negligence in at least the following respects:

      a.     For fiscal year 2007, had FGMK exercised due professional care, it would have identified that the financial statements were not compliant with GAAP and materially misstated for reasons other than the KQF non-consolidation;

      b.     For fiscal year 2007, FGMK knew or should have known that the opinions, as issued, were not appropriate and did not comply with

        professional standards and/or their professional obligations as independent auditors of the Knight Entities;

c.      For fiscal year 2007, FGMK should have disclosed in its report on the financial statements of the Knight Entities that said statements were not prepared in accordance with GAAP for reasons other than the non-consolidation of KQF;

d.      For fiscal year 2007, FGMK failed to disclose "reportable conditions" of which FGMK was or should have been aware; and

e.      For fiscal year 2007, FGMK failed in its audit reports to take exception to the Knight Entities' failure to disclose that their financial statements were presented on the assumption that the entities would continue as "going concerns," despite extant circumstances -- known to FGMK -- which raised substantial doubt regarding the Knight Entities' ability to continue as going concerns.

195.    In providing opinions on the fiscal 2005, 2006, and 2007 financial statements of the Knight Entities, the Auditor Defendants knew that such opinions would be relied upon, and intended that they be so relied upon, by Bank of America.

196.    In failing to report certain reportable conditions that would have called into question the accuracy, quality and reliability of the Knight Entities' financial reporting, the Auditor Defendants knew or should have known that this failure would be relied upon by Bank of America.

197.    As a result of the professional negligence of the Auditor Defendants, Bank of America and others refrained from taking steps within their powers and authority to halt further deterioration of the Knight Entities' financial condition.

198.    Further, even after the disastrous operating results and financial condition of the Knight Entities came to light, the above-described negligence of the Auditor Defendants contributed materially to significant delays in discovering the true financial state of affairs of the Knight Entities and materially aided in preventing the immediate implementation of effective measures in time to reverse the decline in the financial condition of the Knight Entities.

199.    Moreover, after the Knight Entities' bankruptcy petitions were filed, the material misstatements revealed in Knight Industries' financial statements had a material and negative effect on the sale price of the Knight Entities' assets, further escalating the shortfall to Bank of America.

200.    The Auditor Defendants' breach of duty as aforesaid was a direct and proximate cause of Bank of America's inability to timely identify the financial crisis and the financial manipulations of the Knight Management Defendants and take the necessary steps to prevent or minimize the continued deterioration of the Knight Entities' financial condition.

201.    By virtue of the aforesaid breaches of duty and negligence of the Auditor Defendants, the Knight Entities' have been damaged to the full extent of the Knight Entities' insolvency and Bank of America has incurred losses in excess of $34 million.

### COUNT II: *AIDING & ABETTING BREACH OF FIDUCIARY DUTY*

#### *AGAINST THE AUDITOR DEFENDANTS*

202.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 203, with the same force and effect as if fully set forth herein.

203.    As alleged herein, the Knight Defendants breached fiduciary duties owed to the Knight Entities in at least the following respects:

      a.     By failing to direct and manage the affairs of the Knight Entities in a manner that would enable the companies to remain financially viable;

      b.     By improperly shuffling assets and liabilities among certain Knight Entities at whim in order to mask operational failures, a liquidity crisis, and a number of debt covenant violations;

      c.     By manipulating and otherwise mishandling the accounting for and reporting of Knight Industries' and KQF's financial affairs, thus masking the troubled financial circumstances and insolvency of Knight Industries and KQF;

    d.       By causing Knight Industries and KQF to confer personal benefits on and/or give preferential treatment to the Knight Insiders and/or their affiliates contrary to the best interests of the Knight Entities and their creditors, including Bank of America;

    e.       By directing the preferential repayment of purported "capital contributions" and other loans by certain Knight Insiders, without due regard for the interests of Bank of America and other creditors and the deleterious ramifications of such repayment on the interests of Knight Industries and KQF, as well as their creditors primarily Bank of America; and

    f.       By favoring the interests of the KQF-Global, Olney, and KQF-China (collectively "Nondebtor Affiliates"), at the expense of the Knight Entities, and by failing to stabilize the Knight Entities' operations and implement prudent procedures to sell the Knight Entities' assets to maximize recovery for the Knight Entities and their creditors, including Bank of America.

204. With full knowledge of the breaches of fiduciary duties of the Knight Management and the Knight Insiders as alleged above, the Auditor Defendants provided substantial assistance to the Knight Defendants and aided and abetted them in their breaches of fiduciary duties, in, among others, the following ways:

    a.       The Auditor Defendants acquiesced in and/or failed to properly identify and correct accounting manipulations that violated GAAP, which were manipulated by the Knight Management Defendants for the purpose of masking the true financial condition of the Knight Entities;

    b.       The Auditor Defendants failed to conduct their audits in accordance with GAAS and consequently approved the non-disclosure of material information bearing on the accuracy and completeness of the financial reporting of the Knight Entities, which if properly performed, said audits would have uncovered the financial misreporting and manipulations by the Knight Management Defendants; and

    c.       The Auditor Defendants failed to perform, or negligently performed, certain procedures on specific areas of concern knowing that the procedures performed did not substantively address those concerns and, as such, created a false sense of security and avoided further scrutiny of material financial reporting issues.

205.    The Auditor Defendants' actions in this regard were intentional or at least reckless, and occurred in a context in which the Auditor Defendants knew Bank of America was relying on the Auditor Defendants not only for the monitoring of the Knight Entities' financial reporting, but also for serving as a final, independent and honest arbiter on questions of appropriate accounting treatment and the fair presentation of the Knight Entities' financial condition and performance.

206.    The Auditor Defendants' aiding and abetting of the breaches of fiduciary duty by the Knight Defendants, as alleged above, was a direct and proximate cause of the Knight Entities' financial demise and ultimate bankruptcy, in that such action allowed the continued deterioration of the Knight Entities into insolvency, and prevented Bank of America, and others, from taking steps to prevent or minimize the Knight Entities' financial deterioration and/or to maximize recovery on the Knight Entities' assets.

207.    By virtue of the Auditor Defendants' aiding and abetting of breaches of fiduciary duty, the Knight Entities' estates have been damaged to the full extent of the Knight Entities' insolvency and, in turn, Bank of America has been damaged to the full extent of the amount remaining due on its Loans to the Knight Entities, which amount is in excess of $34 million.

208.    By virtue of the Auditor Defendants' aiding and abetting of breaches of fiduciary duty, the Auditor Defendants also are liable for punitive damages.

## COUNT III: *BREACH OF FIDUCIARY DUTY*

### *AGAINST THE KNIGHT DEFENDANTS*

209.    Bank of America repeats and realleges each and every allegation contained in paragraphs 1 through 210, with the same force and effect as if fully set forth herein.

210.    As officers and directors of the Knight Entities, the Knight Defendants owed Bank of America the duty to exercise reasonable care in executing their management and director oversight responsibilities and to refrain from self-dealing.

211.    Notwithstanding their duties as officers and directors of the Knight Entities to exercise absolute fidelity to the Knight Entities and to refrain from placing their personal interests above the corporate interests, the Knight Defendants continually and repeatedly breached those duties by engaging in the wrongful conduct alleged herein.

212.    The Knight Defendants further breached their fiduciary duties to Bank of America by failing to exercise reasonable business judgment through fraudulently prolonging the corporate life beyond insolvency, dissipating the corporate assets and failing to use the corporate debt to protect and further the Knight Entities' financial well-being.

213.    The Knight Defendants' breaches of fiduciary duties, as alleged above, were direct and proximate causes of the Knight Entities' financial demise and ultimate bankruptcy, in that such action allowed the continued deterioration of the Knight Entities into insolvency, and prevented Bank of America, and others, from taking steps to prevent or minimize the Knight Entities' financial deterioration and/or to maximize recovery on the Knight Entities' assets.

214.    By virtue of the Knight Defendants' breaches of fiduciary duties, the Knight Entities' estates have been damaged to the full extent of the Knight Entities' insolvency and, in turn, Bank of America has been damaged to the full extent of the amount remaining due on its Loans to the Knight Entities, which amount is in excess of $34 million.

215.    By virtue of the Knight Defendants' breaches of fiduciary duties, the Knight Defendants also are liable for punitive damages.

## COUNT IV: *GROSS MISMANAGEMENT*

### *AGAINST THE KNIGHT MANAGEMENT DEFENDANTS*

216.    Bank of America repeats and realleges each and every allegation contained in paragraphs 1 through 217, with the same force and effect as if fully set forth herein.

217.    The Knight Management Defendants (Defendants James Knight, Robert Wasielewski and Lisa Rogers) owed a duty to Bank of America to prudently, honestly, loyally, lawfully, and carefully supervise, manage and control the Knight Entities' operations.

218.    Through their gross mismanagement as set forth above, the Knight Management Defendants grossly and unlawfully mismanaged the Knight Entities' assets and business operations in breach of the fiduciary duties they owed to the Knight Entities and are, therefore, liable to Bank of America for damages.

219.    By virtue of the Knight Management Defendants' gross mismanagement, Bank of America has been damaged to the full extent of the amount remaining due on its Loans to the Knight Entities, which amount is in excess of $34 million.

220.    By virtue of the Knight Management Defendants gross mismanagement, the Knight Management Defendants also are liable for punitive damages.

## COUNT V: *CONVERSION*

### *AGAINST THE KNIGHT DEFENDANTS*

221.    Bank of America repeats and realleges each and every allegation contained in paragraphs 1 through 222, with the same force and effect as if fully set forth herein.

222.    The Knight Defendants' conduct, including, *inter alia*, appropriating for themselves the economic benefits derived from the Loan Agreements and resulting business

operations of the Knight Entities, was an unauthorized assumption and exercise, and a conversion, of the rights to the collateral of the Knight Entities owned by Bank of America.

223.    By virtue of the Knight Defendants' conversion of the assets and business opportunities of the Knight Entities, as set forth above, Bank of America has been damaged to the full extent of the amount remaining due on its Loans to the Knight Entities, which amount is in excess of $34 million.

224.    By virtue of the Knight Defendants' unlawful conversion of assets and business opportunities, the Knight Defendants also are liable for punitive damages.

### COUNT VI: *CORPORATE WASTE*

### *AGAINST THE KNIGHT DEFENDANTS*

225.    Bank of America repeats and realleges each and every allegation contained in paragraphs 1 through 226 with the same force and effect as if fully set forth herein.

226.    As directors, officers, and controlling members of the Knight Entities, the Knight Defendants owed a duty to the Knight Entities to prudently, honestly, loyally, lawfully, and carefully supervise, manage and control the Knight Entities' business consistent with applicable laws governing corporate fiduciaries.

227.    Through their actions as detailed above, the Knight Defendants wasted the valuable corporate assets of the Knight Entities by (i) approving and/or accepting fraudulent and unsubstantiated compensation, fees and expenses; and (ii) misappropriating the Knight Entities' assets and business opportunities for their own business and/or personal use to the detriment and ultimate demise of the Knight Entities.

228.    By virtue of the Knight Defendants' waste of the corporate assets of the Knight Entities, as set forth above, the Knight Entities' estates have been damaged to the full extent of

the Knight Entities' insolvency and, in turn, Bank of America has been damaged to the full extent of the amount remaining due on its Loans to the Knight Entities, which amount is in excess of $34 million.

229.     By virtue of the Knight Defendants' waste of corporate assets of the Knight Entities, the Knight Defendants also are liable for punitive damages.

### COUNT VII: *UNJUST ENRICHMENT*

### *AGAINST THE KNIGHT DEFENDANTS*

230.     Bank of America repeats and realleges each and every allegation contained in paragraphs 1 through 231 with the same force and effect as if fully set forth herein.

231.     The Knight Defendants have been unjustly enriched at the expense of Bank of America, which contributed more than $40 million to Knight Industries.

232.     As of at least December 31, 2007, Knight Industries was insolvent. Notwithstanding, the Knight Defendants received and accepted excessive and/or unwarranted compensation and/or other remuneration in connection with their wrongful conduct such that they were unjustly enriched at the expense and to the detriment of Bank of America, by virtue of their use of Bank of America's collateral to pay for said benefits.  Such unjust enrichment goes against the fundamental principles of justice, equity and good conscience.

233.     The Knight Defendants should be required to pay restitution to Bank of America, as Bank of America has no adequate remedy at law.

234.     Bank of America, therefore, seeks disgorgement of all improperly obtained incentive-based compensation, consulting fees and/or other remuneration for the period 2007 through 2009 and imposition of a constructive trust thereon for the benefit of Bank of America.

WHEREFORE, Bank of America prays for relief and an award as follows:

a)      Awarding Bank of America consequential and punitive damages resulting from the Auditor Defendants' misconduct in an amount to be determined at trial;

b)      Awarding Bank of America consequential and punitive damages and disgorgement resulting from the Knight Defendants' misconduct in an amount to be determined at trial;

c)      Awarding pre-award interest on any award of damages at the rate prescribed by law;

d)      Awarding Bank of America the costs of this action, including but not limited to reasonable attorneys' fees and expenses; and

e)      Awarding such other and further relief as the Court deems just and proper.

Dated:   February 15, 2011

Respectfully submitted,
BANK OF AMERICA, N.A.

By: /s/ Michael L. Molinaro
(One of Its Attorneys)

Michael L. Molinaro (6183321)
Theresa Davis (6224757)
Blair R. Zanzig (6273293)
Melissa Mickey (6290226)
LOEB & LOEB LLP
321 North Clark Street, Suite 2300
Chicago, Illinois  60654
Telephone: 312.464.3100
Facsimile: 312.464.3111
  mmolinaro@loeb.com
  tdavis@loeb.com
  bzanzig@loeb.com
  mmickey@loeb.com

*Counsel for Plaintiff Bank of America, N.A.*