IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BANK OF AMERICA, N.A., individually and as )
assignee of certain claims, )
)
       Plaintiff, )    No. 11 C 0303
      v. )
)     Judge Robert W. Gettleman
JAMES A. KNIGHT, CYNTHIA KNIGHT, )
DEFOREST DAVIS, PAUL FLASK, MARIE )
O'BARR, BARRY BRUBAKER, PETER )
WILLMOTT, ROBERT WASIELEWSKI, LISA )
ROGERS, OLNEY PARTNERS LP, KNIGHT )
QUARTZ FLOORING - GLOBAL LLC, )
QUARTZ FLOORING NORTH AMERICA, LLC, )
FGMK, LLC, FROST RUTTENBERG & )
ROTHBLATT, P.C., )
)
      Defendants. )

## MEMORANDUM OPINION AND ORDER

    In an 87 page, 311 paragraph second amended complaint, plaintiff Bank of America,

N.A. has sued defendants James A. Knight, Deforest Davis, Paul Flask, Marie O'Barr, Cynthia

Knight, Olney LP, Knight Quartz Flooring - Global LLC, Quartz Flooring Norther America,

LLC, Robert Wasielewski, Lisa Rogers (the "Knight defendants"), Barry Brubaker, Peter

Willmott, FGMK LLC, and Frost, Ruttenberg & Rothblatt, P.C. ("FR&R," and together with

FGMK the "auditor defendants"), alleging that certain directors, officers and controlling

members of Knight Industries, LLC, Knight Quartz Flooring and Knight-Celotex LLC were

abusing their position of authority and control to loot what the complaint identifies as the

"Knight Entities[1]" by paying benefits to themselves and diverting assets and opportunities for the

_____

[1]The Knight Entities are defined as Knight Industries, Knight-Celotex and certain other
subsidies of Knight Industries.

Knight Entities, which were indebted to plaintiff, into other companies owned and/or controlled by the Knight defendants. In sum, plaintiff alleges that the Knight defendants and Brubaker and Willmott unlawfully drained the Knight Entities of their assets and value, leaving nothing for plaintiff to collect on its $35 million loan to the Knight Entities.

Counts I and II of the second amended complaint ("complaint") allege professional negligence and aiding and abetting breaches of fiduciary duties against the auditor defendants. Count III alleges breach of fiduciary duty of loyalty and good faith against defendants James Knight ("James"), Cynthia Knight, Wasielewski, Rogers, Davis, Flask, O'Barr, and Brubaker and Willmott. Count IV alleges breach of fiduciary duty of care, loyalty and good faith against defendants James, Wasielewski and Rogers. Count V alleges conversion against James, Cynthia Knight, Davis, Flask, O'Barr, Brubaker, Willmott, Wasielewski, Rogers, Olney, KQF - Global and Quartz Flooring North America, LLC ("QFNA"), and Count VI alleges unjust enrichment against James and Cynthia, Davis, Flask, O'Barr, Wasielewski and Rogers. Count VII is brought against James, Cynthia, Davis, Flask, Brubaker and Willmott for usurpation of corporate opportunities. Count VIII alleges veil piercing and alter ego liability against defendants KQF - Global, Olney and QFNA.

Defendants have filed three separate motions to dismiss. The auditor defendants have moved to dismiss the counts brought against them (I and II) for failure to state a claim. The Knight defendants have moved to dismiss all counts against them (III - VIII) pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(6), 8(a) and 9(b), arguing that plaintiff lacks standing to bring the fiduciary duty claims, the claims are not pled with sufficient particularity yet do not contain a short and plain statement of the claims, and fail to state a claim. Brubaker and Willmott have

separately moved to dismiss the counts brought against them (III, V and VII). For the reasons that follow, all motions to dismiss are granted.

### **FACTS**[2]

Despite the unnecessarily prolix nature of the complaint, the court will endeavor to summarize the relevant factual allegations.[3]

### **The Parties**

Plaintiff Bank of America is a national banking association and successor by merger to LaSalle Bank National Association.

Knight Industries, LLC ("Knight Industries") was a holding company that owned substantial equity interest in Knight-Celotex LLC ("Knight-Celotex") and Knight Quartz Flooring, LLC ("KQF"). Knight Industries was the only manager of both entities as well as numerous other related entities. Knight-Celotex was the operating subsidiary of Knight Industries that manufactured and distributed fiberboard products for roofing systems. The Knight Entities manufactured various products for use in the construction industries. KQF produced quartz flooring products for use in various construction settings.

James was the principal owner of Knight Industries and, according to the complaint, served as the Chief Executive Officer, Manager and Chairman of the Board for the Knight Entities and KQF. The complaint alleges that James, either individually or through the Wauregan Company, Inc., which he wholly owned and controlled, received payments and

---

[2]The facts come from the allegations of plaintiff's complaint.

[3]The summary of the complaint in plaintiff's memorandum in opposition to the Knight defendants' motion to dismiss itself is 14 pages long.

transfers from Knight Industries, Knight-Celotex and KQF in excess of $2.5 million for inadequate value, a substantial portion of which was transferred while Knight Industries was insolvent.

Cynthia Knight is James' wife and General Partner of defendant Olney, which served as manager of KQF-Global. Cynthia is also alleged to have served on the Board of the Knight Entities and the KQF Board.

Defendant Davis owed a 17% membership interest in KQF and a 20% membership interest in KQF-Global, served on the Boards of the Knight Entities and KQF as well as several other entities. The complaint alleges that he received payments and transfers from Knight Industries, Knight-Celotex and KQF of more than $200,000 for inadequate value, a portion of which was transferred while the companies were insolvent.

Defendant Flask owned a 4% membership interest in KQF and KQF-Global. He served on the Boards of the Knight Entities and KQF as well as several Knight Entities including defendant QFNA, for which he was a founding member. The complaint alleges that he received over $138,000 from Knight Industries and Knight-Celotex for no or inadequate value while those companies were insolvent.

Defendant O'Barr was a founding investor of Knight Industries, served as its initial Chief Financial Officer and was a member of the Knight Entities Board. She allegedly received payments of over $700,000 for no or inadequate value while Knight Industries was insolvent.

Defendants Brubaker and Willmott were owners of membership interests in KQF and served on the KQF Board and the boards of several other entities. Both were founding members of QFNA.

Defendant Wasielewski served as Senior Vice-President and Chief Financial Officer of the Knight Entities and KQF and was "touted as Chief Financial Officer of Knight Industries' worldwide operations." He held membership interests in KQF and Knight-Celotex.

Defendant Rogers was a member of the senior management teams of the Knight Entities and KQF, serving as Vice-President of Shared Services, head of Human Resources and various other senior positions. She exercised control over the accounting personnel for the Knight Entities and KQF and held membership interests in KQF and Knight-Celotex.

KQF Global is a Delaware corporation comprised of Knight Industries, Olney, Davis, and Frederick W. Mowinkel. KQF Global served as the manager of KQF. KQF Global also served as Manager and held at least a 43% interest in KQF China.

Defendant Quartz Flooring North America, LLC ("QFNA") is a Delaware limited liability company formed on or about May 6, 2009. Its founding members were Cynthia, Davis, Brubaker, Willmott and Flask. Currently defendant Davis serves as Manager and defendant Flask serves as President of QFNA.

Defendants FGMK and Frost, Ruttenberg & Rothblatt ("FR&R") are CPA firms located in Illinois.

## **BACKGROUND**

Plaintiff, through its predecessor LaSalle Bank National Association, started a lending relationship with the Knight Entities in September 2003. By December 31, 2005, plaintiff's outstanding loan to the Knight Entities totaled approximately $32.5 million. On February 14, 2006, plaintiff increased the credit facility to the Knight Entities (the "KE loans") to $43 million pursuant to a certain Amended and Restated Loan and Security Agreement (the "KE Loan

Agreement"). The loans were increased by $1 million on January 31, 2007, and again on September 25, 2007.

Plaintiff also provided to KQF $1.3 million in secured financing (the "KQF loan") pursuant to a Loan and Security Agreement dated February 14, 2006 (the "KQF Loan Agreement"). The obligations and liabilities of KQF to plaintiff under the KQF Loan Agreement are secured by a first priority security interest in all of KQF's property "of any kind or description, tangible or intangible, wherever so located and whether now existing or hereafter arising or acquired." Specifically, plaintiff held a security interest in any and all accounts, inventory, equipment, general intangibles, commercial tort claims, instruments, software and computer programs, investment property and all other property including KQF's intellectual property acquired from its acquisition of Rikett Technology AS.

The Knight Entities' obligations and liabilities under the KE Loan Agreement was secured by a first priority security interest in all of the Knight Entities' accounts, inventory, equipment, investment property, the Knight-Celotex plants, and all other property (the "collateral").

The KE Loan Agreement required the Knight Entities to provide plaintiff with periodic financial statements, maintain a standard and modern accounting system in accordance with generally accepted accounting practices ("GAAP"), and that all annual, monthly or other financial statements be prepared in accordance with GAAP. Specifically, the Knight Entities agreed to provide plaintiff with, (1) annual audited consolidated financial statements of the Knight Entities and subsidiaries, and (2) monthly borrowing base certificates showing the accounts receivables and finished goods inventory, monthly aged account receivable schedules

6

and inventory reports, and computations. Plaintiff alleges that the accuracy of these reports was critical because plaintiff made advances to the Knight Entities and KQF on a monthly basis based on reported accounts receivable and inventory balances. According to plaintiff it was for this reason that the KE Loan Agreement required the Knight Entities to retain independent reputable auditors to review and audit their financial statements.

On September 30, 2008, the KE loan matured and the Knight Entities defaulted by failing to pay the indebtedness due, totaling in excess of $34 million. According to the complaint, in the weeks leading up to the default and in the months following, plaintiff and the Knight Entities discussed and negotiated a potential resolution of the default. By March 2009 it was apparent that all attempts had failed and plaintiff notified the Knight Entities that it intended to exercise its rights under the Loan Agreement including its rights to foreclose on the collateral.

According to plaintiff, while negotiating with plaintiff to cure the loan defaults, the defendants were simultaneously orchestrating a plan to divest the Knight Entities of any remaining assets. In February 2009 James caused Knight Industries to resign as Manager of KQF, effectively relinquishing control of KQF just prior to Knight Industries filing for bankruptcy. This was done to deprive Knight Industries of its voting interest in KQF, which would allow the individual defendants the ability to complete the conversion of assets from KQF to QFNA unencumbered by bankruptcy rules and protections that would govern Knight Industries after it filed for bankruptcy. On February 8, 2009, by written consent, the KQF Board including James, Cynthia, Flask and Davis, who were all also serving as Knight Entities Board members, accepted Knight Industries' resignation and elected KQF-Global as KQF's Manager. KQF-Global was managed by defendant Olney, with Cynthia as its General Partner. In the same

written consent, the Knight Entities board members serving on the KQF Board unanimously approved the conversion of $4,273,360 in loans made by Knight Industries to KQF from debt obligations to non-voting equity interests in KQF.  As a result, the same defendants remained in control of KQF, but they were no longer linked to the Knight Entities or Knight Entities' creditors.  The move also deprived any subsequent receiver or trustee of Knight Industries from any management control over KQF, and allowed Olney and KQF Global to benefit as interest holders from the alleged improper transfers.

On April 6, 2009, Knight Industries and Knight-Celotex filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  Between April and May 2009 the bankruptcy court entered cash collateral orders which contain certain restrictions on Knight Industries' use of cash.  On June 11, 2009, the bankruptcy court granted plaintiff's motion to convert Knight Industries' Chapter 11 case to a liquidation case under Chapter 7 of the Bankruptcy Code.

On January 22, 2010, KQF filed for relief under Chapter 11, which the bankruptcy court converted to a Chapter 7 on February 16, 2010.  James filed for Chapter 7 relief on February 23, 2010, and was granted a discharge on November 10, 2010.  He is named in the instant action as what plaintiff denominates a "nominal" defendant only.

## DISCUSSION

### The "Auditor Defendants'" Motions

Plaintiff has sued the auditor defendants for professional negligence and aiding and abetting the Knight defendants in the alleged breach of their fiduciary duties (Counts I and II). The auditor defendants (FR&R and FGMK) both argue that the claims against them are barred

by the applicable two year statute of limitations in the Illinois Public Accounting Act ("IPAA"),

735 ILCS 5/13-214.2(a) which provides:

> Actions based upon tort, contract or otherwise against any person, partnership or corporation registered pursuant to the Illinois Public Accounting Act, as amended, or any of its employees, partners, members, officers or shareholders, for an act or omission in the performance of professional services shall be commenced within two years from the time the person bringing an action knew or reasonably should have know of such act or omission.

This two year statute of limitations begins to run when the plaintiff knew or reasonably should have know both: (1) of its injuries; and (2) that the injury was wrongfully caused. At that point the burden is on the injured person to inquire further to determine whether an actionable wrong was committed and whether a cause of action exists. Knox College v. Celotex Corp., 88 Ill. 2d 407, 415 (1981). "Wrongfully caused" does not mean that the plaintiff must have knowledge of the defendant's negligent conduct before the statute is triggered. "At some point the injured person becomes possessed of sufficient information concerning his injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved. At that point, under the discovery rule the running of the limitations period commences. [T]his is usually a question of fact." Id. at 416-17.

The auditor defendants argue that plaintiff's cause of action accrued, and the statute began to run, on September 30, 2008, when the Knight Entities first defaulted on over $35 million in loan obligations under the Loan Agreements. Defendants contend that at that point plaintiff was on notice of the need to investigate why its borrower defaulted and whether, and against whom, the plaintiff may have had causes of action. To support this argument, the auditor defendants rely exclusively on City National Bank of Florida v. Checkers, Simon & Rosner, 32

F.3d 277, 283-84 (7th Cir. 1999), which they contend holds that a lender's third-party claim for accounting malpractice accrues on the date the accountant's client defaults on the loan.

Although analogous, <u>Checkers</u> is not factually identical to the instant case, and its holding is not so broad as defendants assert. In <u>Checkers</u>, the plaintiff bank had agreed to loan $500,000 to its borrower in part based on unaudited statements compiled by the defendant accountants that indicated the borrower had a net worth of between $24.6 million and $32.3 million. The borrower had requested and received three short extension but never repaid the loan. The bank declared a default and then filed a fraud action against the borrower. The borrower filed bankruptcy, and in a deposition the bank learned that the accountants had a long-standing relationship with the borrower and thus likely knew the financial computations were false. The bank sued the accountants over two years after the declaration of default.

The Seventh Circuit held that the bank's cause of action accrued on the day the default was declared, stating that the borrower's repeated failure to repay the loan and the ultimate default should have put the bank on "notice of a need to investigate why an individual with such a substantial net worth (as reported by the accounting firm) defaulted and whether, and against whom, the bank may have had causes of action." <u>Id</u>. at 283-84. The court's holding was obviously influenced by the vast discrepancy between the reported net worth and the reported inability to repay a comparatively small loan.

The instant case is not as clear cut as was the default in <u>Checkers</u>. Plaintiff alleges that it reasonably believed itself to be fully secured, based on the information in the audited statements and representations by the individuals controlling the Knight Entities that the default was simply a result of general economic conditions and that the Knight Entities had implemented

appropriate steps to improve their financial condition. In particular, plaintiff points to a pre-default meeting with defendant James and Wasielewski in which they represented that they had addressed the Knight Entities' financial difficulties, which they attributed in part to the general economy and unusual spikes in natural gas prices in the fall of 2008. James and Wasielewski presented a revised business plan with revised projected financial results based on restructuring that would reduce operating expenses and increase profitability.

They also represented that the Knight Entities' collateral had a gross value of approximately $57 million, far in excess of the loans. According to plaintiff, the credibility of the representations was bolstered in October 2008 when it received FGMK's audit report for the year ending December 31, 2007. The complaint also details plaintiff's monitoring of the Knight Entities financial progress in the following months up to and after Knight Industries and Knight-Celotex had filed for bankruptcy on April 6, 2009.

The allegations of the complaint, which the court must accept as true, outline "potential explanations other than fraud [or auditor negligence] for the decline and ultimate bankruptcy of the company." See Household Commercial Financial Services, Inc. v. Trump, 863 F. Supp. 735, 740 (N.D. Ill. 1994). There is a point when plaintiff had sufficient information concerning its injury and the cause to put a reasonable person on inquiry to determine whether actionable conduct occurred. That point, however, cannot be determined from the face of the complaint. Accordingly, the auditor defendants' motions to dismiss based on statute of limitations is denied.

Next, the auditor defendants argue that Count I, alleging professional negligence, fails to state a claim because plaintiff cannot allege that the auditor defendants owed it any duty.[4] Actions by non-clients against an Illinois accountant are governed by § 30.1 of the IPAA, 225 ILCS 450/30.1, which provides:

> No person, partnership, corporation, or other entity licensed or authorized to practice under this Act or any of its employees, partners, members, officers or shareholders shall be liable to persons not in privity of contract with such person, partnership, corporation or entity for civil damages resulting from such acts, omission, decisions or other conduct in connection with professional services performed by such person, partnership, corporation or other entity, except for

> (2) such other acts, omissions, decisions or conduct, if such person . . . was aware that a primary intent of the client was for the professional services to benefit or influence the particular person bringing the action . . ..

To state a claim against an accountant for negligence under the IPAA a plaintiff must allege that it was a primary purpose of the accountant-client relationship to benefit or influence the third party. <u>Tricontinental Industries, Ltd. v. Price Waterhouse Coopers, LLP</u>, 475 F.3d 824, 839 (7th Cir. 2007). Plaintiff must allege: (1) the intent of the client for the accountant's work to benefit or influence the third party; and (2) the accountant's knowledge of that intent. <u>Builders Bank v. Barry Finkel & Associates</u>, 339 Ill. App.3d 1, 7 (1st Dist. 2003). "This `primary intent' may be demonstrated by `independent verification' or by other affirmative actions taken by the accountant and directed to the third party." <u>Tricontinental</u>, 475 F.3d at 837-38. Although independent verification is not a per se requirement, <u>some</u> affirmative action on behalf of the defendant-accountant is necessary." <u>Id</u>. at 837 (emphasis in original).

---

[4]Defendant FR&R has actually moved to dismiss for "lack of standing" under the IPAA, but its argument is the same as presented by defendant FGMK in its motion to dismiss.

In the instant case, plaintiff alleges generally that "the auditor defendants knew that [plaintiff] was relying on the financial statements of the Knight Entities being reviewed and audited by the auditor defendants and further knew that it was a primary intent of the Knight Entities and KQF for the audit opinions and other work to benefit and influence [plaintiff]. The Knight Entities and KQF provided [plaintiff] with the audited financial statements to comply with the covenants in the Loan Agreements and to induce [plaintiff] to loan additional funds." This allegation is simply a formulaic recitation of the elements set out in the statute and, as the auditor defendants argue, too conclusory to be entitled to an assumption of truth. Ashcroft v. Iqbul, 556 U.S. 662, 129 S.Ct. 1937, 1951 (2009); Bell Atlantic Corp.v. Twombly, 550 U.S. 544, 555 (2007).

The court thus turns to the factual allegations in the complaint to determine if they plausibly suggest an entitlement to relief. In addition to the general conclusory allegations, the complaint alleges that:

- FGMK expressly acknowledged in its Engagement Acceptance Form, dated December 31, 2007, under the item requesting a brief description of the "intended use of the financial statements" that, among other things, the "[f]inancial statements will be distributed to lenders" (i.e. Bank of America).

- FGMK prepared a multi-page Schedule of Calculations, included in its workpapers, which related to the Knight Entities' "Compliance with Covenants" and referenced the specific sections of the KE Loan Agreement setting forth the relevant financial covenants.

- FGMK's 2007 audit workpapers included copies of the KE Loan Agreement, in which Section 9.7 states that the Knight Entities shall furnish to Bank of America as soon as available a copy of their annual audited consolidated financial statements.

- The 2007 financial statements and audit report referenced the "loan and security agreement" with Bank of America, as well as the relevant financial covenants set forth in the KE Loan Agreement.

- The financial statements prepared by FR&R for fiscal year-end 2005 and 2006referenced the KE Loan Agreement with specific citations to the relevant financial covenants.

- In the 2005 Audit Planning Memo, FR&R opines that "it does not appear that there are any loan covenant compliance issues.

- In FR&R's "Engagement Acceptance Form," dated December 31, 2006, FR&R stated in the item requesting "Use of FR&R reports" that it was to be used for "Debt."

- In the workpapers entitled, "2006 Audit Program for Notes Payable and Longterm Debt," FR&R notes that "[t]he Company has received the waiver for loan covenants for the year ended 12/31/06 due to Merrero shut down."

- FR&R's 2006 audit workpapers included copies of the KE Loan Agreement, in which Section 9.7 states that the Knight Entities shall furnish to Bank of America as soon as available a copy of their annual audited consolidated financial statements.

These allegations at best suggest that the auditor defendants knew that the client would distribute the audited statements to lenders including plaintiff. Most audited statements are so distributed. There is nothing in the allegations to suggest (plausibly or otherwise) that it was a primary intent of the Knight Entities that the audited statements would be used to benefit or influence plaintiff, or that the auditor defendants were aware of that primary intent. There certainly is no allegation of any form of independent verification by the auditor defendants, nor is there any allegation of any affirmative action taken by either auditor defendant directed to plaintiff. The complaint does not allege, for example, that the auditor defendants provided any information such as audited reports or draft audited reports directly to plaintiff, as alleged in Comerica Bank v. FGMK, LLC, 2010 WL 2723177 at *2 (N.D. Ill. July 2, 2010), the case chiefly relied upon by plaintiff. Nor does the complaint allege that either auditor defendant met with plaintiff, as in Builders Bank, 339 Ill. App.3d at 6-7, or that the auditor defendants sent their audit opinions to plaintiff, as in Freeman, Freeman & Salzman, P.C. v. Lipper, 349 Ill. App.3d 677, 681 (1st Dist. 2004), or that the auditor defendants met with representatives of plaintiff and

stated that the audit was accurately performed according to generally accepted auditing standards, as in <u>Chestnut Corp. v. Pestine, Brinati, Gamer, Ltd.</u>, 281 Ill. App.3d 719, 721 (1st Dist. 1996).

"The purpose of an audit report is to make sure the audited company's financial statements – which are prepared by the company, not the auditor . . . – correspond to reality, lest they either have been doctored by a defalcating employee or innocently misrepresent the company's financial situation." <u>Fehribach v. Ernst & Young LLP</u>, 493 F.3d 905, 910 (7th Cir. 2007) (internal citations omitted). By their very nature such reports are typically reviewed by third parties such as lenders, shareholders, regulators (i.e. SEC), creditors, as well as management. The mere fact that the auditor defendants could have foreseen that their reports would be sent to third parties such as plaintiff is insufficient to establish a duty under the IPAA. <u>Kopka v. Kamensky and Rubenstein</u>, 354 Ill.App.3d 930, 938 (1st Dist. 2004) ("Accordingly, we reject Kopka's assertion that the corporation's accountant, AMG, owed a duty of care to all persons who would foreseeably rely on its statements, as this is not the law in Illinois."). For the "primary purpose" requirement to have any meaning there must be more than just awareness that the statements will be sent to lenders. There must be "some affirmative action" by the auditor defendant that demonstrates knowledge that a primary intent of the audit was to influence the lender. <u>Tricontinental</u>, 475 F.3d at 837.

Indeed, the allegations in the complaint are not significantly different, and certainly no more specific, than the allegations held insufficient to establish a duty under the IPAA by the Seventh Circuit in <u>Tricontinental</u>, <u>id</u>. at 838:

163. Prior to the time that PwC [Auditor] had conducted its 1997 audit PwC had assisted Anicom [client] in raising money for acquisitions and finding acquisition

candidates. And in 1997 PwC well knew that Anicom was seeking to complete additional acquisitions . . . . PwC most certainly knew that acquisition candidates, such as Plaintiffs, would rely on the 1997 Form 10-K in making their decisions on whether to invest in Anicom's securities.

164. PwC knew prior to the closing of the Texcan transaction that Plaintiffs were negotiating to sell significant assets to Anicom in exchange in part for Anicom securities. PwC w conducted due diligence of Texcan for Anicom . . . . PwC knew that Plaintiffs had received and were relying on Anicom's Form 10-K for 1997 and, in particular PwC's unqualified audit report, and that Anicom intended that Plaintiffs rely on the 10-K and PwC's audit report in assessing investment in Anicom . . . . Despite its awareness of these facts, and despite its knowledge from its own investigation and its involvement in the business of Anicom that Anicom was engaged in improper accounting practices and lacked adequate controls to prevent these irregular practices, PwC intentionally or recklessly failed to withdraw its audit opinion on the 1997 financial statements. Instead PwC allowed Plaintiffs to rely on the false and misleading information contained in Anicom's Form 10-K for 1997.

In affirming Judge Bucklo's dismissal of the claims against PwC, the Seventh Circuit stated, "these allegations do not demonstrate any 'independent verification' provided by PwC to Tricontinental," and "none of the allegations contained in the above-recited paragraphs support" an inference that "a primary purpose of the accountant-client relationship [was] to benefit or influence Tricontinental." Id. at 839.

The same is true of the instant allegations. They at most show that the auditor defendants could have foreseen (and perhaps knew), that plaintiff would review and rely on the audit reports. But there are no allegations that demonstrate any independent verification, no allegation of any affirmative action by the auditor defendants toward plaintiff, and no allegations to support an inference that a primary purpose of the relationship with their clients was to influence plaintiff.

In sum, the court concludes that the allegations in the complaint are insufficient to state a claim for negligent misrepresentation under the IPAA. Accordingly, the auditor defendants' motions to dismiss Count I is granted.

Count II charges the auditor defendants with aiding and abetting the Knight defendants breach of fiduciary duties. The elements of a claim for aiding and abetting are: (1) the party whom the defendant aids must perform a wrongful act which causes an injury; (2) the defendant must be regularly aware of his role as part of the overall or tortious activity at the time that he provides the assistance; and (3) the defendant must knowingly and substantially assist the principal violation." Grimes v. Saikley, 388 Ill. App.3d 802, 819 (4th Dist. 2009).

Once again the amended complaint alleges generally that the auditor defendants "knowingly provided substantial assistance to the [Knight defendants] and aided and abetted them in their breaches of fiduciary duties in the following ways." The complaint then lists the ways in which the auditor defendants allegedly assisted. Each point listed, however, simply accuses the auditor defendants with professional negligence. The amended complaint is wholly devoid of any factual allegations that plausibly suggest that either auditor defendant was regularly aware of its role in the alleged tortious activity and knowingly and substantially assisted. In short, Count II is, as defendants assert, simply duplicative of Count I and fails to state a claim for either aiding or abetting or professional negligence. Accordingly, the auditor defendants' motion to dismiss Count II is granted.

**Individual Defendants**

Jurisdiction/Standing

As an initial matter, the Knight defendants argue that to the extent that plaintiff brings its breach of fiduciary duty and usurpation of corporate opportunity claims in Counts III, IV and VII in its capacity as a creditor of the Knight Entities, plaintiff lacks standing. Brubaker and Willmott raise the same argument with respect to the claims brought against them in Counts III, V and VII.

It is well-settled that "a single creditor may not maintain an action on his own behalf against a corporation's fiduciaries if that creditor shares in an injury common to all creditors and has personally been injured only in an indirect manner." Koch Ref. v. Farmers Union Central Exch., Inc., 831 F.2d 1339, 1349 (7th Cir. 1987). The creditors of a Delaware corporation that is insolvent or in the zone of insolvency have no right to assert direct claims for breach of fiduciary duty. Vichi v. Koninklijke Phillips Electronics, N.V., 2009 WL 4345724 *20 (Del. Ch. 2009). Any claims for breach of fiduciary duties against officers, directors and shareholders of a corporation that could be enforced whether by the corporation directly or by the shareholders derivatively before bankruptcy, become property of the estate which the trustee alone has the right to pursue after a filing of a bankruptcy petition. Koch, 831 F.2d at 1343. Thus, plaintiff has no direct claim against defendants for breach of fiduciary duties and does not argue that it does.

Plaintiff does argue, however, that it has standing to bring the claims alleged in Counts III, IV, V and VII because it does not bring them to recover any direct injury it suffered, but brings them instead as the assignee of "all interest of the Knight Entities in and to such claims."

The Chapter 7 Trustee for the bankruptcy estates of Knight Industries and Knight-Celotex moved for and was given leave to enter into an Assignment of Claims Agreement with

plaintiff whereby the trustee assigned to plaintiff all of Knight Industries' and Knight-Celotex's potential claims against James and other officers and directors as set out in two letters from plaintiff and the trustee attached to the motion (the "D&O claims").  There is no question that the claims assigned include the claims alleged by plaintiff, at least with respect to Knight Industries and Knight-Celotex.  But defendants argue that KQF's D&O claims are another matter because there was no assignment in the KQF bankruptcy.  Thus, defendants argue that plaintiff has no standing as an assignee to bring the KQF breach of fiduciary duty claims that are at the heart of Counts III, VI and VII.  And, because only members, not creditors, have standing to sue derivatively an insolvent Delaware LLC, defendant argues that plaintiff lacks any standing to bring the KQF claims.  CMLV, LLC v. Bax, 28 A.3d 1037, 1041 (Del. Sup. Ct. 2011).

As plaintiff argues, however, Knight Industries owned 47% of KQF, and as a member had the right under Delaware law to bring derivative claims on its behalf.  Id. at *4.  Knight Industries assigned that right to plaintiff in its assignment agreement.  Thus, plaintiff has standing to bring the KQF and D&O claims as derivative actions.

Thus, plaintiff is correct that the assignments from the Knight Industries and Knight-Celotex estates give it standing to bring certain claims against defendants for breach of fiduciary duties.  But the claims cannot be brought directly for injuries specific to plaintiff.  The trustees assigned to plaintiff the right to bring the estates' claims against the directors and officers for breach of duties owed to those companies.  Any claims against defendants for breach of duties owed to KQF must be brought as a derivative action that complies with Fed. R. Civ. P. 23.1 and Delaware law regarding derivative actions, including a demand that the company bring the

action, or that such a demand would be futile. See <u>Mitchell ex.rel. Broadwind Energy, Inc. v.</u> <u>Reiland</u>, 2012 WL 1755677 at * 3-4 (N.D. Ill. 2012).

Counts III, IV and VII fail to meet these standards. They do not seek recovery for all creditors but rather allege damage specific to plaintiff and seek recovery only for plaintiff. Thus, the claims are not brought derivatively, or on behalf of all creditors and are considered direct actions that are unavailable under Delaware law. <u>Vichi</u>, 2009 WL 4345724 at *20; <u>Tooley v.</u> <u>Donaldson, Lufkin & Jenrette, Inc.</u>, 845 A.2d 1031, 1033 (Del. 2004); <u>North Am. Catholic Educ.</u> <u>Programing Found., Inc. v. Gheewalla</u>, 930 A.2d 92, 98-99 (Del. 2007).

There are as well other deficiencies with the counts, both procedural and substantive. Although the counts allege claims for breach of fiduciary duties and usurpation of corporate opportunities, they are based on a scheme to defraud the Knight Entities' creditors in general and plaintiff in particular. Fed. R. Civ. P. 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." A complaint alleging fraud must provide "the who, what, when, where and how." <u>DiLeo v. Ernst & Young</u>, 901 F.2d 624, 627 (7th Cir. 1990). The rule applies to "all averments of fraud, not claims of fraud," so whether the rule applies to Counts III, IV and VII depends on plaintiff's factual allegations. <u>Borsellino v. Goldman Sachs Group, Inc.</u> 477 F.3d 502, 507 (7th Cir. 2007). "A claim that sounds in fraud – in other words, one that is premised upon a course of fraudulent conduct – can implicate Rule 9(b)'s heightened pleading requirements." <u>Id</u>.

The complaint basically describes the nature of the action as a scheme by the individual officers, directors and controlling members of Knight Industries, Knight-Celotex and KQF with the aid of the auditor defendants, to obtain substantial loans from plaintiff by issuing materially

20

misleading financial statements and other financial information on which plaintiff relied to extend credit. As such, the complaint describes generally fraudulent conduct, particularly with respect to a scheme to divest KQF of all of its assets after it became insolvent. Despite its unwieldy length, however, the complaint falls woefully short of complying with the mandates of Rule 9(b). It lumps all of the defendants together, never describing which defendant is responsible for what conduct or when each defendant participated in that unspecified conduct. As defendants note, each asserted count simply realleges the over 225 preceding paragraphs, without making any attempt to identify the factual allegations on which each count rests, making it extremely difficult if not impossible to determine whether the count complies with Rule 9(b) as to each individual defendant. Therefore, to the extent that the claims asserted in Counts III, IV and VII are based on averments of fraudulent conduct, those averments fail to comply with Rule 9(b) and are dismissed.

Rule 9(b) is strictly construed, however, and it applies to averments of fraud and mistake only. Kennedy v. Venrock Associates, 348 F.3d 584, 593 (7th Cir. 2003). "And if both fraudulent and nonfraudulent conduct violating the same statute or common law doctrine is alleged, only the first allegation can be dismissed under Rule 9(b), though if, while the statute or common law doctrine doesn't require proof of fraud, only a fraudulent violation is charged, failure to comply with Rule 9(b) requires dismissal of the entire charge." Id. (Internal citations omitted).

Not all breaches of fiduciary duty are based on fraudulent conduct, and plaintiff argues strenuously that its claims are not. In such a situation the court is required to disregard all improperly pled averments of fraudulent conduct and determine if the remaining allegations

support the breach of fiduciary duty claims under the notice pleading standards of Fed. R. Civ. P. 8(a). That is an unenviable task in the instant case, considering the length and confusing nature of plaintiff's complaint. And while plaintiff argues that its complaint "more than satisfies Rule 8(a)'s requirement of `a short and plain statement of the claim showing that the pleader is entitled to relief,'" nowhere in its 70 page response memorandum[5] does plaintiff identify which of the 311 paragraphs in the complaint support a breach of fiduciary duty claim or usurpation of corporate opportunity claim that are not based on fraudulent conduct.

The court recognizes that plaintiff's claims are complicated and that post <u>Twombly</u> more detailed complaints are required. But there is nothing short or plain about plaintiff's complaint. Even before <u>Twombly</u>, under Rule 8 a complaint must be presented "with clarity sufficient to avoid requiring a district court or opposing party to forever sift through its pages in search of plaintiff's claim. <u>Jennings v. Emry</u>, 910 F.2d 1434, 1436 (7th Cir. 1990). It is not the court's job to scour the complaint to determine which allegations support each count. It is plaintiff's job to do so in its brief. It has not. The counts fail under both Rules 8(a) and 9(b) and are dismissed for that reason as well.

There are substantive problems with these counts as well. The court agrees with defendants that the complaint fails to allege how each of the named defendants owed any fiduciary duties either to plaintiff or to the individual companies. Plaintiff repeatedly asserts that defendants were members of the Board of the Knight Entities and that they assumed positions of control over the Knight Entities and KQF giving rise to fiduciary duties. But there is no such

---

[5]The court recommends that the lead attorney proofread his briefs more carefully, and points him to the (annoying) heading on every page of his 70 page brief labeling it "Table of Contents Continued."

thing as the "Knight Entities," which is a term used in the complaint simply to refer to Knight

Industries, together with Knight-Celotex and several other subsidiaries. As best the court can

ascertain from the complaint, there is no board of directors of the Knight Entities. There was a

Board of Advisors for Knight Industries and a Board of Members of KQF, and while plaintiff

has carefully avoided any reference to the operating agreements for Knight Industries and

Knight-Celotex, leaving the court to guess as to the actual authority of their boards[6], the

complaint never actually alleges that the boards of either of those companies had any decision

making authority. The most that plaintiff alleges is that those boards considered and advised the

managers of each company. Advisors, however, are not fiduciaries. See Hecker v. Deere & Co.,

556 F.3d 575, 583-84 (7th Cir. 2009).

Additionally, the complaint does reference the KQF operating agreement, and that

agreement provides that the manager (Knight Industries) "shall have the sole and exclusive right

to manage, control and conduct the affairs of the Company . . . ." The agreement requires the

creation of a board of members to "advise and consult with the manager on matters related to the

strategic direction of the Company, acquisitions, divestitures, and management performance

evaluations." Approval of a majority of the board was required only for the manager to enter

into an agreement for the sale of a material portion of the assets of the company. Thus, nothing

in the KQF operating agreement supports plaintiff's claim that the individual defendants who

---

[6]Plaintiff's first two complaints referred to and relied on the Knight Industries and
Knight-Celotex operating agreements. Those agreements became the bases of defendants'
motions to dismiss those complaints. Faced with those motions plaintiff elected to replead,
carefully removing any reference to the two agreements. Defendants invite the court to examine
the agreements suggesting that they are already part of the record, but the court declines. The
two agreements are not referred to in the current complaint and are considered outside of the
current record.

were members of the KQF board of members owed any fiduciary duties to the company, at least with respect to the allegations of the instant complaint.

In sum, the complaint fails to allege sufficiently that any of the individually defendants owed any fiduciary duty to the "Knight Entities."  Therefore, in addition to being procedurally faulty, Counts III, IV and VII, which are all based on alleged breach of fiduciary duties, fail to state a claim.

The remaining counts are equally deficient.  For example, Count V alleges conversion.  It once again incorporates the initial 225 paragraphs and then alleges generally that the conduct of the Knight Entities officers, directors and manager and the KQF directors, manager and controlling members, including appropriating for themselves the economic benefits derived from the Knight Entities and KQF Loan Agreements, was an unauthorized assumption, exercise and conversion of the assets and property of the Knight Entities and KQF, which constituted the plaintiff's collateral.

To recover for conversion under Illinois law plaintiff must show: (1) a right to the property; (2) an absolute and immediate right to possession of the property; (3) a demand for possession; and (4) that defendants' wrongfully and without authorization assumed control, dominion or ownership over the property.  Van Diest Supply Co. v. Shelby County State Bank, 425 F.3d 437, 439 (7th Cir. 2005).  Plaintiff is correct when it argues that courts widely recognize that "an action for conversion is a proper remedy for a secured party to bring against a third party when its collateral has been disposed of by the debtor."  Helms v. Certified Packaging Corp., 551 F.3d 675, 678 (7th Cir. 2008).  That does not mean, however, that plaintiff does not have to plead facts supporting its claims.

24

Because the Loan Agreements entitled the borrowers to possession and use of the collateral until an event of default, plaintiff did not have an absolute and unconditional right to immediate possession of the collateral until there was a default under the loans. Thus, plaintiff has a claim for conversion only for actions taken after an event of default. But plaintiff never made a demand for the Collateral (or at least the complaint does not allege a demand) that defendants' refused to honor, thereby wrongfully assuming control.

Plaintiff argues that under the Loan Agreements once the Knight Entities and KQF defaulted it had an absolute right to take immediate possession of the collateral "without notice, demand or legal process of any kind . . .." This argument misses the point. The contracts are what gave plaintiff the immediate right to possess the collateral. To state a claim for the tort of conversion, however, plaintiff must have made a demand to enforce that right to which defendants must have refused to comply. Van Diest, 425 F.3d at 439. Because the complaint fails to allege such a demand, Count V fails to state a claim for conversion.

Count VI alleges unjust enrichment against James, Cynthia, Davis, Flask, O'Barr, Wasielewski, and Rogers. The count again repeats and realleges the first 225 paragraphs and then alleges generally that these defendants were unjustly enriched at plaintiff's expense by converting, usurping, obtaining and retaining excess assets (or the equivalent value of same) and valuable business opportunities belonging to the Knight Entities and KQF which they transferred or caused to be transferred to themselves and/or entities that they owned and/or controlled, leaving the Knight Entities and KQF unable to satisfy their obligations to their creditors, primarily plaintiff.

To state a claim based on a theory of unjust enrichment, plaintiff must allege that defendants have unjustly retained a benefit to plaintiff's detriment, and that defendants' retention of the benefit violates the fundamental principles of justice, equity, and good conscience. HPI Health Care Services, Inc. v. Mt. Vernon Hosp., Inc., 131 Ill.2d 145, 160 (1989). Because plaintiff is seeking recovery of a benefit that was transferred to defendants by a third party, plaintiff is required to plead sufficient facts to plausibly suggest that defendant's conduct was wrongful. Id. at 162; Bell Atlantic, 550 U.S. at 570.

Aside from the general allegations set forth above, plaintiff's unjust enrichment claim is based on the allegation that James received payments in excess of $2.5 million "a substantial portion of which was transferred when Knight Industries was insolvent." The complaint contains similar allegations with respect to Davis, Flask, and O'Barr, but does not allege that Cynthia, Wasielewski or Rogers received any payments, either before or after any of the Knight Entities became insolvent. Because plaintiff cannot allege that any payments made before insolvency were improper, the sum of the factual allegations supporting Count VI is that James, Davis, Flask, and O'Barr received some unspecified payments at some unspecified time after the Knight Entities and KQF were insolvent. Even under liberal notice pleading standards these allegations are insufficient to support a claim for unjust enrichment. Accordingly, defendants' motion to dismiss Count VI is granted.

Finally, Count VIII is a claim for "veil piercing & alter ego liability against defendants KQF-Global, Olney and QFNA," essentially alleging that the individual defendants "disregarded the separateness of numerous entities in the Knight Industries corporate hierarchy and disregarded other corporate formalities on numerous occasions regarding the complex web of

26

limited liability companies. The count then alleges that defendants KQF-Global, Olney and

QFNA were mere instrumentalities or alter egos of the individual defendants used as vehicles to

accomplish the unjust and inequitable scheme identified in the complaint. Because the court has

dismissed all of the underlying claims, Count VIII is also dismissed. See Fontana v. TLD

Builders, Inc., 362 Ill.App.3d 491, 500 (2d Dist. 2005) ("The doctrine of piercing the corporate

veil is an equitable remedy; it is not itself a cause of action but rather is a means of imposing

liability on an underlying cause of action, such as a tort or breach of contract.").

## CONCLUSION

For the reasons described above the auditor defendants' motions to dismiss (Docs. 68,

82), Brubaker and Willmott's motion to dismiss (Doc. 71) and the Knight defendants' motion to

dismiss (Doc. 74) are all granted. Because plaintiff has had three attempts to state a claim, the

second amended complaint is dismissed with prejudice.


**ENTER:**      **June 20, 2012**


**Robert W. Gettleman**
**United States District Judge**


27